**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**LOCAL 798 OF the UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF the PLUMBING AND PIPEFITTING INDUSTRY OF the UNITED STATES AND CANADA, AFL–CIO, Defendant.**

No. 84–C–730–C.

United States District Court, N.D. Oklahoma.

Sept. 5, 1986.

Robert Harwin, Assoc. Gen. Counsel, E.E.O.C., Washington, D.C., for plaintiff.

Tom L. Armstrong, Marsha & Armstrong, Tulsa, Okl., for defendant.

## FINDINGS OF FACT

## AND

## CONCLUSIONS OF LAW

H. DALE COOK, Chief Judge.

This is an action brought by the plaintiff, the Equal Employment Opportunity Commission (EEOC), against the defendant, Local 798, for alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

Under the provisions of Title VII, plaintiff claims Local 798 discriminated against blacks and women by excluding them from membership and by failing to refer them for employment in the welder and welder helper positions. Plaintiff pursues its action under both the disparate treatment and disparate impact theories of recovery. Plaintiff seeks a permanent injunction, appointment of an administrator to carry out

an affirmative action plan, back pay awards and other appropriate relief.

Defendant Local 798 denies all allegations of discrimination either intentionally or in effect against blacks and women in its referral and membership practices. Defendant alleges as its defense that the nature of the pipeline industry and the kind of work required has thwarted the interest of blacks and women in the industry. Specifically, defendant asserts that pipeline construction in remote areas, involving rough terrain, discourages black and female applicants. Further, defendant alleges that downhill welding is a highly specialized skill which limits the number of qualified applicants. The union also contends that it does not hire the welders or welder helpers, but rather they are hired by the contractors, and therefore the union is absolved of any discriminatory intent. Finally, Local 798 contends that the economic conditions within the pipeline industry have discouraged applicants other than relatives of existing Local 798 members.

After considering the pleadings, the testimony and exhibits admitted at trial, the briefs and arguments presented by counsel for the plaintiff and defendant, and being fully advised in the premises, the Court enters the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### A. Jurisdiction and Venue

1. This Court has federal jurisdiction pursuant to 28 U.S.C. §§ 1343 and 1345. Venue is proper pursuant to 28 U.S.C. § 1391.

2. Local 798 is a member organization of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL–CIO.

3. Local 798 is an unincorporated association of participating employees which deals with employers concerning terms and conditions of employment.

4. Local 798 is a labor organization engaged in an industry affecting commerce.

5. Local 798 has at least fifteen members, and has had at least fifteen members since the effective date of Title VII, July 2, 1965.

6. EEOC fulfilled the conditions precedent to institution of this lawsuit. These conditions included a reasonable cause determination, an adequate investigation and a good faith attempt to conciliate.

### B. Background

7. Local 798 is a union of approximately 5,200 members. It has jurisdiction within 40 to 42 of the United States, with exclusive jurisdiction in 38 states. Many of these states have a large concentration of blacks.

8. The four crafts involved in pipeline construction are: the Laborers' International Union of North America; the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America; the International Union of Operating Engineers; and the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada (the Local 798 affiliate). Local 798 was formed in 1949 with its headquarters in Tulsa, Oklahoma. Clifton Throneberry has been its Business Manager since 1974. The Business Manager is the chief executive officer of the union.

9. Local 798 is a unique local within the United Association, as it represents nearly all unionized pipeline welders in the United States.

10. Local 798's members are skilled welders, skilled pipefitters and unskilled helpers. Plaintiff's lawsuit is limited to the welder and helper classification. Welders are engaged in a specialized form of welding called "downhill welding" which is used only in the laying of oil and gas pipelines. Welder helpers are not considered apprentices for welder work.

11. Local 798 is engaged in the supervision, fabrication, construction, installation,

maintenance and repair of pipeline installation.

12. Every three years the United Association negotiates a National Pipeline Agreement with the Pipeline Contractors Association.

13. Currently Local 798 has no black members and there were no female members until the eve of trial, May 1986, when Local 798 admitted a woman into the membership. Prior to May 1986, there was a total preclusion of all blacks and women; Local 798 membership was exclusively white males. Blacks and females have been barred from Local 798 throughout its 42 state jurisdiction throughout the history of the union.

### C. Availability

14. The Court finds that blacks have continually been available at Local 798 job sites for work. Since the late 1970's women have steadily been available for work on Local 798 jobs.

15. A non-union contractor, Eddie Purnell, estimated that since 1979 he has personally seen 25 to 50 blacks and an equal number of females seeking employment on Local 798 job sites.

16. George Swiger has worked in the pipeline industry for 40 years and has been a superintendent at various pipeline jobs. From 1971 through 1980 Swiger had blacks approach him for work on Local 798 jobs. He did not assist them because it would threaten his own job security. Women went to job sites when work was available but were turned away because of their sex.

17. J.T. Holloway was a business agent in Local 798 from 1969 until 1984. He had calls from blacks seeking membership over a 15–year period.

18. The evidence revealed that non-union pipeline contractors have hired women in welder helper positions and office work. John Reed, a non-union contractor, has employed 30 to 40 female welder helpers in the past 10 years.

19. The welder helper position is an unskilled job, which does not require prerequi-site training. The welder can provide on-the-job training for the helper. It takes approximately one day to learn the trade, and one week to be a "valued" helper.

20. The welder helper's work is interchangeable with the laborer's work. Numerous willing blacks and women could do helper work.

21. Qualified black welders were refused membership applications and given the "run-around" when they contacted the union. George Walker, a black male, has been a welder since 1965. He is qualified to do downhill, uphill and horizontal welding. He has done downhill welding and high pressure pipeline work for 5 years. He sought and was refused membership in Local 798 from 1965 to 1985. Sylvester Washington, a black male, learned to weld in 1969. He holds certification papers in four welding positions. He sought membership in Local 798 and was told the union was not accepting new members. Dwight Jordan, a black male, is an experienced welder. He applied for and was denied membership in Local 798 in March 1985.

22. The evidence showed that pipeline contractors hired blacks and women for pipeline work out of the operating engineers, laborers and teamster unions even though they were not permitted to hire blacks and women for welder and welder helper positions out of Local 798. These unions worked at the same job site, on the same pipeline, and under the same contractor, contemporaneously.

### D. Recruitment

23. Nepotism is the primary means of membership recruitment within Local 798. The Court finds that since the 1970's most new members were male relatives of existing members. Nepotism was fostered through membership meetings and Local 798's newsletter, the Bluelight. Generally only Local 798 members attended union meetings, and only Local 798 members received the Bluelight.

24. Members are only permitted to recruit white male relatives: cousins, broth-

ers, sons, nephews, sons-in-law and uncles. No female relatives are permitted membership books.

25. There is an unwritten practice that if a business agent or welder foreman hires a woman or black for work on the pipeline, the agent or foreman will be fired.

26. Joseph Wyatt joined Local 798 in 1954. He was a business agent from 1965 to 1976. He has two sons as well as male cousins and nephews who are Local 798 members. In 1976 Clifton Throneberry fired Joseph Wyatt as a business agent because he tried to put his daughter to work on the pipeline.

27. George Swiger was a member of Local 798 for 25 years, he has been a welder foreman and steward. He has two brothers, two sons-in-law and several male grandchildren as Local 798 members. He was prohibited from getting membership books for his daughters.

28. Jessie Teague, a welder, tried to get his wife a membership book, but Clifton Throneberry would not allow it. Jessie Teague obtained a membership book for his son in 1981.

29. O.D. Adams is a journeyman fitter and works on pipelines. He also has a son in the industry. O.D. Adams tried to get his wife and daughter-in-law membership books with Local 798 but was told by Clifton Throneberry "the pipeline is no place for a woman."

30. The written policy, as stated in Local 798's constitution and bylaws is:

> All candidates for membership in Local Union 798 must be proposed in writing by three (3) members in good standing and approved by the Examining Board, who shall vouch for the candidate, stating name, age, residence and where employed. Initiation fee plus three (3) months dues shall accompany said application.

In practice, the Court finds, that membership is restricted to male relatives of existing members and any other white male who is in good favor with the business manager, Clifton Throneberry.

31. EEO–3 reports prepared by Local 798 for the following periods reflect that Local 798 did not have any female or black members as of the following dates:

September 22, 1977
July 18, 1979
July 10, 1980
May 12, 1982
June 10, 1983
April 20, 1984
February 12, 1985

### E. Referral/Dispatch

32. By contract, Local 798 and the pipeline contractor are allowed a proportionate share of employees to hire as workers on each job. The designated number of workers hired directly by the contractor versus the number dispatched by the union is as follows:

| No. of Employees Hired Directly By Contractor | No. of Employees Dispatched By Union |
|---|---|
| 1–4 | 1 |
| 5–8 | 2 |
| 9 | 3 |
| 10 | 4 |
| 11 | 5 |
| 12 | 6 |
| More than 12 | Every other one, on alternating basis. |

33. The pipeline contractor hires the welder foreman who must be a member of Local 798. The welder foreman hires the contractor's quota of welders and helpers. They generally hire members of Local 798 who live in the locale of the pipeline work.

34. Local 798's quota is to be taken from the dispatch wheel. Under the written policy contained in the "Dispatching and Hiring Roster Policies", any member out of work may place his name on the dispatch wheel. Regardless of the job location, the Dispatcher is to call the first member whose name is at the top of the wheel. The Dispatcher will make two efforts to contact the member and if no contact is made, the name goes to the bottom of the wheel. Further, if the member declines the job, without a qualified reason, his name goes to the bottom of the wheel.

35. The Court finds that, in practice, Local 798 can control or influence all hiring

on the pipeline, including the contractor's quota. Clifton Throneberry can control the conduct of the welder foreman as to which members are hired and fired. If a member is in disfavor with Clifton Throneberry, he is fired or never dispatched to a job. Local 798 members have given gifts to Clifton Throneberry in an effort to stay in good favor. Clifton Throneberry controls contractors through intimidation. If a contractor does not conduct its hiring in accordance with Clifton Throneberry's unwritten policies, then welder foremen are directed to engage in work slow-downs, stoppage and pickets.

### F. Policies and Practices

36. The Court finds Local 798 has an unwritten policy of excluding blacks and women which is strictly enforced. Business agents and welder foremen are instructed by Clifton Throneberry not to hire blacks and women, to discourage their interest in Local 798 and to "get rid of them" if they are hired by a pipeline contractor.

37. C.N. McLean has worked in the pipeline industry for 39 years. As superintendent for a pipeline contractor, he was told by J.T. Holloway to fire three female welder helpers who were employed by the contractor. Mr. Holloway told McLean to "fire the whores".

38. In 1977 a Pennsylvania pipeline contractor placed a black welder helper on the job. Local 798 members "shut-down" work on the pipeline refusing to work with a "nigger" on the job.

39. At union meetings throughout Local 798's jurisdiction, Clifton Throneberry made statements that he has never had to accept blacks and women but that with the investigation by the EEOC he didn't know how much longer he could keep them out.

40. The minutes for the membership meetings contain the following statements:

Cliff reported that the Local had a lot more Helpers now than it has Welders. The selling of books is just about at a standstill, except for sons and sons-in-law, to try to keep the quota more equal. He said he thought that anyone should always be able to get his son or son-in-law a book. (Minutes, January 9, 1981).

Brother Throneberry read charges that had been filed on the Local by the E.E. O.C., charging the Local with discriminations against blacks and women. He read some correspondence from the E.E. O.C. informing the Local that it is going to be investigated. He said that before long we will have to take some blacks and women into the Local Union, and that it would probably be on a percentage based on our membership. Cliff explained how he intended to handle the charges and what he thought the outcome would be. He said he had a meeting set up with their E.E.O.C. representative for the first week in January, and that it would be only a matter of time until we would have blacks and women members. We may very well be the last Local in the U.A. that doesn't already have them. (Minutes, December 11, 1981).

### G. Reputation

41. The Court finds that Local 798 has a nationwide reputation for not admitting blacks and women for membership or referral; union members and pipeline contractors who breach this unwritten policy will face adverse consequences.

42. The Court finds Clifton Throneberry controls the conduct of business agents, welder foremen and perpetuates Local 798's policies and practices of discrimination.

### H. Victims

43. The Court finds that the following persons are victims of unlawful employment practices and discrimination due to the individual's race or sex in violation of Title VII of the 1964 Civil Rights Act:

Pamela Layton

Sharon Sue Statts

Joy Lee Swafford

George Walker

Dora Jeanette Teague

Rae Jean Dowe

Wilbert Brown

Jeannie Adams

Alma Faye Adams

Alecia Branson

Sylvester Washington

Wilma Jean Fleming

Dorothy Savage

Cheryl Laroque Todd

Shenette Davis

Dwight Jordan

## CONCLUSIONS OF LAW

### A. Jurisdiction and Venue

1. The Court has jurisdiction and venue over this action.

2. The EEOC is an agency of the United States charged with the administration, interpretation and enforcement of Title VII and is expressly authorized to bring this action by Title VII, 42 U.S.C. § 2000e–5(f)(1).

3. Local 798 is a labor organization engaged in an industry affecting commerce within the meaning of Title VII, 42 U.S.C. § 2000e(d) and (e).

4. All procedural and administrative actions required by law were followed by the EEOC within the meaning of Title VII, 42 U.S.C. § 2000e–5(b).

### B. Liability of Local 798

5. Since at least July 2, 1965, Local 798 has engaged in unlawful employment practices in violation of Title VII, 42 U.S.C. § 2000e–2, by discriminating against blacks and/or women on the basis of race, color and sex by:

    a. excluding blacks and women from membership, and

    b. failing and refusing to refer blacks and women for employment.

■ 6. Local 798 has engaged in intentional discrimination resulting in disparate treatment of blacks and women. The policies and practices of Local 798 have had a discriminatory effect resulting in disparate impact on blacks and women. In disparate treatment discrimination "[t]he employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin." *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). Disparate impact discrimination "involve[s] employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another." *Teamsters,* 431 U.S. at 336 n. 15, 97 S.Ct. at 1854 n. 15.

### C. Disparate Treatment Discrimination

■ 7. The framework established by the Supreme Court in *McDonnell Douglas Corp. v. Greer,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) governs the order and burdens of proof in employment discrimination actions, including disparate treatment cases. The plaintiff must establish by a preponderance of the evidence that the union was involved in discriminatory employment practices. If the plaintiff meets its prima facie case, the focus of the litigation shifts to the union's motive. The union must rebut plaintiff's prima facie case by coming forward with a legitimate, nondiscriminatory reason for its practice.

■ 8. EEOC has established a prima facie case of disparate treatment discrimination by Local 798. Local 798's membership and referral practices are violative of Title VII, 42 U.S.C. § 2000e–2(a), in that Local 798 regularly and purposefully treats blacks and females less favorably than white males. Disparate treatment involves intentional discrimination. Proof of discriminatory motive is necessary, although it can be inferred from the mere fact of differences in treatment. *Teamsters,* 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15. The following is a list of the intentional discriminatory practices by Local 798 which had the purpose and design of excluding blacks and females:

    a. Between 1976 and 1985 Local 798 had a policy of excluding blacks and females that was announced openly at its membership meetings. For

each of these years, members clearly understood blacks and females were not allowed to be members nor recruited for membership. This was evidenced by the minutes prepared from the meetings, and the testimony of members.

b. Local 798 had a policy of firing females when non-union contractors were taken over who had female employees on the pipeline.

c. Local 798 had a policy that female relatives and friends of members could not obtain membership books although male relatives could obtain membership at any time.

d. .Local 798 had a policy that business agents and welder foremen were to decline requests by blacks and females for membership in the union.

e. Officials and officers of Local 798 had a practice of using racial and sexist slurs.

There is overwhelming evidence that a discriminatory purpose has been the motivating factor in the membership and referral practices of Local 798. *See e.g., Arlington Height v. Metropolitan Housing,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 540 (1977). Since July 2, 1965, the effective date of Title VII, Local 798 has had a total exclusion of all blacks and women. Local 798 did not come forward with any credible evidence to rebut plaintiff's prima facie showing. The union's inability to rebut the inference of discrimination came from "the inexorable zero" number of blacks and women in Local 798. *Teamsters,* 431 U.S. at 342 n. 23, 97 S.Ct. at 1858 n. 23.

### D. Disparate Impact Discrimination

■ 9. The EEOC bore the initial burden of establishing a prima facie case of disparate impact discrimination. It had to establish by a preponderance of the evidence that race and sex discrimination "was the union's standard operating procedure—the regular rather than the unusual practice." *Teamsters,* 431 U.S. at 336, 97 S.Ct. at 1855. (footnote omitted). The disparate impact theory of discrimination "has

been applied where clearly identifiable employment requirements or criteria, regardless of whether there was intent to discriminate, resulted in a less favorable impact on a protected group." *Coe v. Yellow Freight System, Inc.,* 646 F.2d 444, 450 (10th Cir. 1981). Proof of disparate impact gives rise to a prima facie case of employment discrimination upon a showing that "the practices operate to exclude members of a protected group." *Coe, supra* at 451. The burden then shifts to the employer to show that its practice is job-related. *Id.*

■ 10. A claim of disparate impact exists when employment practices that are basically neutral in their treatment result in a less favorable impact on a protected group. *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The total exclusion of blacks and women from Local 798 has been accomplished through neutral policies and practices. The policies are neutral in the sense that if Local 798 was a racially and sexually integrated union, these policies would not be unlawful or offenses. Local 798's unlawful practices are as follows:

a. Policy of nepotism—the preference for male relatives in an exclusively white male union.

b. Policy of three-member endorsement.

c. Policy of limiting recruitment—limited to announcements at union meetings, Bluelight newsletter and word-of-mouth.

11. These policies and practices of Local 798 have resulted in a complete absence of blacks and females in membership and referrals. The evidence revealed that blacks have continuously been available for work at the job sites and since the late 1970's females have been available and seeking pipeline work. In fact, blacks and females have been hired and have worked for other crafts in the pipeline industry and for non-union contractors. This gross statistic, standing alone, constitutes prima facie proof of a pattern or practice of discrimination.

12. The evidence was void of any possible justification, job relatedness or business necessity for the union's discriminatory conduct. In a disparate impact case the union carries a heavy burden of production and must prove business necessity to rebut a prima facie case. Moreover, "[t]he practice must be essential, the purpose compelling." *Williams v. Colorado Springs, Colo.*, 641 F.2d 835, 842 (10th Cir.1981).

13. In *Griggs,* the court held that "practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory practices." *Griggs,* 401 U.S. at 430, 91 S.Ct. at 853.

14. Local 798 engaged in a system-wide pattern and practice of employment discrimination for no legitimate justifiable business necessity. *Teamsters,* 431 U.S. 324, 97 S.Ct. 1843.

15. In pursuing its exclusionary and nepotistic policies, Local 798 engaged in a pattern and practice of discrimination on the basis of race and sex in its membership and referrals. *See, e.g., Local 53 of Int. Ass'n of Heat & Frost I & A Workers v. Vogler,* 407 F.2d 1047 (5th Cir.1969) (factually similar case).

16. Title VII was designed "to assure equality of employment opportunities." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In enacting Title VII Congress sought to "remove barriers that have operated in the past to favor an identifiable group of white employees over other employees." *Griggs,* 401 U.S. at 429–430, 91 S.Ct. at 852–53. To achieve these goals Congress "proscrib[ed] not only overt discrimination but also practices that are fair in form, but discriminatory in operation." *Id.* at 431, 91 S.Ct. at 853.

### E. Egregious Conduct

17. Charges have been brought against Local 798 before the Montana Human Rights Commission, and the Alaska Human Rights Commission, alleging, respectively, sex and race discrimination. Today, Local 798, after various lawsuits throughout the United States, persists in its discrimination. At the time of trial, Local 798 still did not have one black member. The union's recently limited effort to admit female members does not change the situation. At trial Clifton Throneberry, the Business Manager, expressed little, if any, knowledge about the Alaska litigation, orders or other legal activities and he is apparently unconcerned with its mandate.

18. At trial Clifton Throneberry stated, in reference to the union's recruitment efforts, that in his opinion the union "went all out to get women and blacks" by making announcements at union meetings and in the Bluelight.

19. Local 798's reputation for excluding blacks and women has had a chilling effect on applicants. Women and blacks were chilled (or deterred) in their desire to apply for membership. *Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843; *Kohne v. IMCO Container Co.,* 480 F.Supp. 1015, 1037 (W.D.Va.1974). In view of the union's reputation, its allegation of lack of interest by victims is not creditable. *Dobbins v. Electrical Workers, IBEW Local 212,* 292 F.Supp. 413, 433–34 (S.D.Ohio 1968).

The evidence establishes liability by Local 798 in violation of Title VII. Local 798 has practiced blatant discrimination over an extended period of time. The evidence shows that Local 798 has consciously and intentionally prevented females and blacks from becoming members, and from effectively participating as welder or welder helpers in the pipeline industry. No effective recruitment policies have been attempted by the union to remedy the situation. The atmosphere within the union and at the job sites has not only chilled applicants from among blacks and females, but has frozen the white male status quo.

The Court has bifurcated the liability and remedy stages of this action. Under the evidence submitted to this Court, by the parties, exhibits, pleadings, and briefs, the Court finds for the Equal Employment Op-

portunity Commission and against the defendant Local 798, on its claim for liability under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e–2 in that defendant Local 798 has engaged in unlawful employment discrimination based on race and sex in its membership and referrals.