**Davine ALEXANDER, James Carson, Arthur Lee Cook, Dwayne Allen Curry, Everett L. Howard, Art Tomblin, Donald Waytes, Richard A. Lilly, Edward Turner II, Percy Pouewells, Lee N. Coffee, Isiah Johnson, Jr., Jimmie Rice, Ronald Colvin**

v.

**LOCAL 496, LABORERS INTERNATIONAL UNION OF NORTH AMERICA, Floyd B. Conrad, Laborer's International Union of North America, Defendants.**

No. C84–3916.

United States District Court,
N.D. Ohio, E.D.

Dec. 10, 1991.

Edward G. Kramer, Kenneth J. Kowalski, Susan R. Borison, Kramer & Tobocman Co., L.P.A., Alan C. Rossman, James G. Corrigan, Cleveland, Ohio, for plaintiffs.

Alan S. Belkin, Shapiro, Turoff, Gisser & Belkin, Cleveland, Ohio, for Local Union 496 and Floyd Conrad.

Eben O. McNair, Schwarzwald, Robiner, Wolf & Rock, Cleveland, Ohio, Theodore T. Green, Washington, D.C., for Laborer's Intern. Union of North America.

MEMORANDUM OF OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING DEFENDANTS' LIABILITY

KRENZLER, District Judge.

INTRODUCTION

This is a civil rights action whereby the plaintiff class members contend that they were denied union membership and employment opportunities by the defendant unions because of their race.

This Court certified the present case as a class action with the plaintiff class being all black persons who applied for or could have applied for a position at the Perry Nuclear Plant.

Plaintiffs have alleged that the policies and practices of Local 496 of the Laborers International Union of North America ("Local 496") and its Business Manager, Floyd Conrad, regarding admittance of blacks to Local 496 and referral of blacks to jobs as laborers violates Title VII, 42 U.S.C. §§ 2000e, *et seq.*, and 42 U.S.C. § 1981.

The Laborers International Union of North America ("International Union") was also brought into this case as a party defendant. An international union can be held liable for the discriminatory actions of an affiliated local union either on an agency relationship with the local or on the basis that it has an affirmative duty to oppose discrimination by one of its locals.

Plaintiffs have attempted to prove their case under two separate theories. The first theory is that the union's policies have a disparate impact upon blacks and the second is that the union is guilty of a pattern or practice of disparate treatment of blacks.

The plaintiffs have contended that the union has selected applicants for membership in a racial pattern significantly different from the general pool of applicants.

The defendants have contended that the methodology for admitting persons into the union is based on business purpose. The plaintiffs contend that this alleged business purpose is a pretext.

The plaintiffs attempted to make their prima facie case of discrimination by statistics and other evidence. They attempted to show a disparity by comparing the percentage of defendants' members who are members of the class with the percentage of the general population in the appropriate geographic area representing members of the class.

Union policies and procedures that may be neutral on their face but which produce discrimination are unlawful.

The plaintiffs contend that a requirement for applicants for union membership is they must first be "in the calling," which means that they must have a job before they can be admitted to the union. We are dealing in this case only with job applicants and applications for union membership in regard to the Perry Nuclear Plant.

The plaintiffs contend that inasmuch as the Perry Nuclear Plant is a secured area and applicants for jobs with contractors cannot get into the area, it is virtually impossible for applicants to make application and get jobs unless they have some relationship with either the employer or the union representatives. The plaintiffs contend that because the union officers and their friends and relatives are working for the contractors in the Perry Nuclear Plant, they have access and thus recommend their friends for employment and thus membership into the union, and that this methodology discriminates in fact against the minority applicants. The plaintiffs contend that inasmuch as approximately 30% of the union members are all related and friends and white that this in and of itself shows discrimination in fact and a violation of Title VII.

Plaintiffs contend that the entire methodology employed by the Local, the International and the employers, results in discrimination. It is noted that the employers are not parties to this case.

Local 496 contends that all it does is admit applicants into membership after they have a job and all of the hiring is done by employers and therefore the union has not discriminated and cannot be charged with discrimination.

The International Union contends that it has not discriminated and has no obligation whatsoever to monitor or control the local union. The International Union has a requirement that in order to be a member the applicant must be "working at the calling" of labor at the time he or she seeks to enter the union. The International Union contends that it does not discriminate in fact and cannot be held liable even if Local 496 has discriminated.

In determining whether there is discrimination, statistics were used in this case and one of the concerns is the geographical area involved. If Cuyahoga County were included that would make the applicant pool of qualified workers substantially higher than if Cuyahoga County were not included.

The plaintiffs have alleged and introduced evidence that the defendant Local 496 and the International Union have discriminated against blacks by their rules and regulations and by their practices and methods in the hiring process and the admission of members. They contend that in 1975 there were 100 members in the union and that 10 were black, and that in 1988, there were approximately 500 members in the union and less than 20 were black.

While the methodology used by employers and the union in hiring employees and admitting them into the union may appear to be race neutral on its face, through a series of connected and disconnected processes they result in discrimination. There is much fingerpointing and blaming each other among the employers, the Local Union, the International Union, and the plaintiff class employees.

The plaintiffs allege that the total picture results in discrimination and that it is not proper to take the isolated events and not connect them together into a series of events that reflect discrimination.

The defendant Local 496 takes the position that it is almost an innocent bystander, just one link in the flow of applicants and jobholders.

Local 496 contends and submits evidence that the International charter or constitution requires that one must be "in the calling" before he or she can be admitted into the union. Local 496 contends that it is not a hiring hall and that all employees are not hired by the union and then referred to the employer. The agreement between the employers and the union is that the employer can do its own hiring and whoever they hire will be automatically admitted into the union. Further, the employer can request a certain number of named people and the union will automatically admit them into membership. While the employers are not parties to the case, the testimony of some employers is that they recognized they could only hire union members and that whenever they wanted someone, they would hire them and they would be admitted into the union. If they were not union members, they would send the person they wanted to hire to the union hall to be admitted into membership. This had to be done within seven days of employment. The union automatically admitted such people into membership. While, as stated above, the employers are not parties to the case, they stated that they hired whoever applied for a job if and when there was a vacancy. They also contend that if they wanted to get an employee from the union, they either asked for a specified person, sent the person they hired to the union hall, or asked the union for a certain number of people. They did not specify black or white and they took whomever the union sent them. The employers contend that if any applicant or potential applicant believed that there was discrimination by the employer, such people should have filed a grievance or a discrimination charge against the employer.

Local 496's Business Manager, Floyd Conrad, who is the key player in this case, contends that he was only a referral agent. Whenever an employer hired someone, he accepted him into the union. If the employer referred someone by name, he would admit them into the union. Whenever an employer asked for a certain number of unnamed employees, he would send only his unemployed union members. He would never send an unemployed non-union person. He has a very simplistic story in that he was there to look out for the existing members. There was a high rate of unemployment and he did not want to admit into membership anyone who was not in the calling as required by the International Union. However, whoever an employer hired, he would admit into membership. He, in effect, contends that he is merely a conduit for the flow of applicants, hired personnel, and membership. In other words, he would just admit into membership whoever had a job or was hired by an employer and, on occasion when requested, he would send people to employers, but only unemployed union members.

The International Union takes the position that it is only an international union and Local 496 is not its employee, agent, or representative in any manner. Local 496 is totally independent of it and the International Union cannot control the daily affairs of Local 496. Further, the International Union argues that it was not aware of all of the alleged discrimination charges and activities going on at the local level.

Everyone, including the employers and Local 496, contends that they did not discriminate.

While this scenario may appear to be race neutral, when all of the component parts are put together and looked at as one picture or a mosaic, the results are clearly discriminatory. This is the classical case of a facially neutral program that resulted in discrimination in fact.

The good part about this case is that there is not much dispute about the history and the operative facts about what happened. It is the conclusions to be drawn from the evidence or the inferences that come from the evidence that make it difficult for a court to decide whether or not there was discrimination.

First, there is the statisticians' dispute which results in a different conclusion based on the beginning point of what constitutes the applicant pool. Once this determination is made by the expert, the conclusion is foregone. With a broader applicant pool such as proposed by plaintiffs' expert, Dr. Pendleton, there clearly was discrimination because of the disparate impact. Taking the more narrow, restricted applicant pool of defendants' expert, Dr. Martin, there was not a disparate impact and, thus, not discrimination.

The law in regard to discrimination is now clear and well settled. The plaintiff class has the burden of proving discrimination. The plaintiffs must first demonstrate a *prima facie* case. This may be done by direct evidence and the inferences coming therefrom and/or statistical evidence which would indicate a disparate impact. The defendants then have the burden of going forward with demonstrating a business purpose to explain the disparate impact. The plaintiffs would then go forward to demonstrate that the business purpose was, in fact, a pretext to cover up the discrimination.

In this case, the plaintiffs made a *prima facie* case by the statistics, direct evidence, and inferences coming from that evidence which clearly demonstrated a disparate impact. The defendant Local 496 had a very simple story which I have repeated several times above and that its business purpose was to protect its unemployed members and not add excessive members to the union rolls which would create discontent. Local 496's goal was to have 100 percent employment of its union members and by just admitting people into membership without jobs would create more problems than it would solve. The union contends that it only referred union members to employers when requested and also admitted into membership any person who was hired by an employer. That is all that it did and that that was its business purpose.

It was a simple, straightforward situation and the union did not discriminate.

Obviously, if the employers only hired white persons and the union only admitted into membership people who had jobs, the result was that a high percentage of the union membership would be white. Further, if the union only referred upon request union members, then they would be referring whites because whites were only hired in the first place and those were the only people admitted into membership in the union. So it was a vicious circle that perpetuated the hiring and rehiring of whites and limited the number of blacks who got hired and thus admitted into the union. While it appeared to be a facially neutral operation and nondiscriminatory, one would have to be an ostrich with its head in the sand not to recognize that the result of all of this was discrimination and one knew, or should have known, that this facially neutral process and operation clearly resulted in discriminatory impact and, consequently, discrimination in fact against black persons who wanted to get jobs and join the union.

It is clear that Local 496 was hiding behind the hiring practices of the employers. The thing that this Court does not understand is why there were not a large number of discrimination cases filed against the employers if they, in fact, were hiring whites in a disproportionate number or percentage in relationship to the applicant pool for such jobs.

The overall process, taking into consideration all of the factors, was clearly a pretext.

## INTERNATIONAL UNION

The International Union takes a simplistic view in that it just, in effect, licenses the local and the local is independent and the International Union has no duty or obligation in regard to monitoring or checking as to whether Local 496 discriminated.

The evidence is clear that the International Union knew, or should have known, about all of the activities going on at Local 496 in regard to the hiring practices and the overall picture. Further, there were sufficient complaints brought to the attention of the International Union in the form of direct complaints by some of the minorities and also the communications between Mr. Conrad and the International Union's field representative.

Under these circumstances, the International Union cannot be a neutral, passive bystander and attempt to avoid liability.

The International Union had a duty and an obligation when it knew or should have known about discriminatory practices to at least investigate and become involved in the system and process and alert the local as to the overall program and that it may result in discrimination charge and successful litigation.

Thus, the International Union was as much a part of the program as Local 496 and is as culpable and liable for the discrimination that this Court found to exist in the hiring of blacks and in the admission of blacks into the union.

## FINDINGS OF FACT

1. Local 496 and the International Union are labor organizations as defined in 42 U.S.C. § 2000e(d), (e).

### *Hiring at Perry Generally*

2. Pursuant to an agreement with the Cleveland Electric Illuminating Company, Local 496 operated the exclusive referral hiring hall for laborers at the Perry Nuclear Power Plant. According to that agreement, the local was to refer both members and non-members of the union for laborers' jobs.

3. Local 496 was the exclusive referral source for laborers at the Perry Nuclear Power Plant. Local 496 had an agreement with Local 860 of Cleveland, with which Local 496 shared jurisdiction over the Perry Plant, to refer Local 860 members to laborer jobs at Perry.

4. Over 30% of the union members have relatives and/or friends who are also union members. One of the prime ways of acquiring membership in the union and/or a job referral is through the intervention of a relative or friend. During the relevant period the Perry Nuclear Power Plant was

the primary employer of laborers in Lake County. Because of security at the plant, it was not possible for prospective employees to solicit contractors at the plant for positions as laborers.

5. Minority applicants for jobs did not have access to the employers at the Perry Nuclear Power Plant for hiring purposes because it was a secured area.

### Local 496 Membership & Referral Practices Generally

6. Floyd Conrad has been the Business Manager for Local 496 since 1974. The duties of the Business Manager include the following: (a) taking care of complaints which arise from the members; (b) finding employment for the members; (c) investigating new jobs to determine when they will begin and how many laborers will be needed; (d) making sure that all union contractors are paying union scale wage; (e) making referrals for laborer positions at the Perry Nuclear Power Plant.

Floyd Conrad testified on direct examination, cross-examination and in response to the Court's questions, in a very low-keyed, simple, straightforward manner about the various procedures.

He acknowledged that all of the various collective bargaining agreements incorporated the President's Executive Order and the anti-discrimination laws passed by the Congress.

He stated, in a straightforward manner, that as Secretary/Treasurer and, in effect, Chief Operating Officer of Local 496, his job was to protect his members and to have as many of them employed as he could.

He acknowledged that the International Union requires that one be "working in the trade" before one can join the union. He stated that whenever an employer advised him that the employer was hiring someone, the hiree would automatically get in the union. He testified that whenever an employer asked the union for an unspecified person to fill a position, he would then send someone from his unemployed members list. He never sent a non-member, whether black or white, to fill a job at the request of an employer. His stated reason was that

his job was to protect union members and that if he sent unemployed non-union members, his union members would become angry with him.

He stated that if an employer was discriminating in fact against blacks, then the blacks should file a grievance. He stated that he did not believe that he or his union had any obligation to monitor or police discrimination by employers. He stated that his job was simply that of referring unemployed members for jobs at the request of employers and that his job was not to recommend for employment unemployed non-union members.

He conceded that the fact that the Perry Nuclear Power Plant was a secured area and that access to the employers was more readily available to the people working on the site than it was for people off the site. However, he stated that the blacks working at the Perry Nuclear Power Plant had equal access to the employers as the whites working at the Plant and that they could have recommended their friends and relatives, the same as the whites and that it was up to the employer as to whom they wanted to hire.

While all of the foregoing individually may be innocuous or neutral, when taken cumulatively and as a whole they result in sufficient evidence by which a trier of the fact could find discrimination by the Local and the International Union.

### Local 496 Membership Practices

7. The Constitution and By–Laws governing Local 496 expressly provide that Local 496 can only induct into membership individuals working at the calling as laborers. Local 496 has territorial jurisdiction over the building construction work in Lake County, Ohio. The work force in Lake County, Ohio, is 1.3% black. The average membership in Local 496 over the period relevant to this lawsuit is in excess of 3% black.

8. The rule which requires a prospective new member to be working in the calling in order to be initiated as a member is not applied uniformly. The rule was regularly

waived during the period of the union's rapid growth, primarily for white applicants.

9. A standard initiation fee is charged by Local 496. This initiation fee is applied to all members regardless of race.

10. The procedure for hiring and admission into Local 496 was neutral on its face.

11. Local 496 initially refused and continued up to January 22, 1990, to refuse black persons membership in the union based on the provision in the International Union's Uniform Local Union Constitution, Article III, Section 1(a), which states: "In order to be eligible for membership a person must be working at the calling within the territory of the Local Union in which the individual applies for membership." This provision is incorporated in the International Union's own Constitution at Article XVI, Section 1. This provision has been used by Local 496 to deny membership to blacks and to deter blacks from applying for membership in order to keep Local 496 mainly an all white union.

12. Black applicants for membership in Local 496 were met with a reluctant or even, at times, hostile attitude of the Business Manager.

13. All of the named plaintiffs approached the union to apply for membership. Not one was accepted.

14. The experience of Donald Robinson, one of the few black union members, reveals a discriminatory animus of the Business Manager against the admission of blacks into Local 496.

15. On a few occasions in 1982, Davine Alexander appeared at Local 496's union hall and requested membership in the union. Ms. Alexander was advised that she could not be inducted into membership unless she was working at the calling.

16. Ms. Alexander has never worked as a laborer for a contractor having a collective bargaining agreement with Local 496.

17. On May 4, 1984, Ms. Alexander filed a charge of discrimination against Local 496 with the EEOC. Ms. Alexander's charge of discrimination against Local 496 related to her claim that she was improperly denied membership in Local 496.

18. The union contends that it cannot automatically allow anyone who applies for membership to become a member without having a job because there were too many unemployed members. If this were done it would create discontent among the union members and create problems for the union leaders and officers. This is a somewhat inconsistent argument because if the union took everyone into membership who got hired, and contractors hired a lot of non-union members who later became members of the union, it would produce the same result; to-wit, a large number of unemployed union members. This, too, would create discontent. The credibility of the union's argument is questionable.

*Statistics Regarding Local 496 Membership and the Labor Force*

19. During 1983 and 1984 black membership for Local 496 varied from 2.8% to 3.59%. The following table shows the total number of members and number of black members of Local 496 during the years 1983 and 1984:

| DATE | TOTAL | BLACK MEMBERSHIP |
|---|---|---|
| 1/83 | 501 | 18 |
| 2/83 | 509 | 17 |
| 3/83 | 509 | 17 |
| 4/83 | 508 | 17 |
| 5/83 | 507 | 17 |
| 6/83 | 509 | 17 |
| 7/83 | 514 | 17 |
| 8/83 | 511 | 16 |
| 9/83 | 509 | 16 |
| 10/83 | 510 | 16 |

| DATE | TOTAL | BLACK MEMBERSHIP |
|------|-------|------------------|
| 11/83 | 514 | 16 |
| 12/83 | 513 | 16 |
| 1/84 | 516 | 16 |
| 2/84 | 519 | 16 |
| 3/84 | 516 | 15 |
| 4/84 | 521 | 15 |
| 5/84 | 523 | 18 |
| 6/84 | 520 | 18 |
| 7/84 | 536 | 18 |
| 8/84 | 545 | 18 |
| 9/84 | 545 | 18 |
| 10/84 | 545 | 18 |
| 11/84 | 545 | 18 |
| 12/84 | 544 | 18 |

20. Between 1980 and 1985 the number of members of Local 496 has ranged from 509 to 545 members and the number of black members has ranged from 16 to 20. The percentage of the membership that was black has ranged from 2.88% to 3.59%.

21. As of April, 1985, of the 531 active members of Local 496, 93.5% of the members lived in one of four counties: Lake, Ashtabula, Cuyahoga and Geauga. The distribution of the residency of the members is as follows:

| Lake | 290 | 54.6% |
| Ashtabula | 125 | 23.5% |
| Cuyahoga | 49 | 9.2% |
| Geauga | 33 | 6.2% |
| Others | 34 | 6.4% |

22. The 1980 Census indicates that blacks comprise 18.4% of the population of the counties of Lake, Ashtabula, Cuyahoga and Geauga.

23. According to the 1980 Census, the labor force in Cuyahoga, Lake, Ashtabula and Geauga counties contained 147,524 blacks out of 898,493 persons. Thus, blacks comprised 16.4% of the labor force in the four-county area.

24. The 1980 Census also reports that 23.4% of the portion of the workforce in the category of handlers, equipment cleaners, helpers and laborers, in Cuyahoga, Lake, Ashtabula and Geauga counties were black.

25. Between 1975 and 1979, Local 496's membership grew from approximately 100 to over 500, an increase of more than 500%. Black membership increased from 10 or 12 members to 18 members during that time.

26. Between April 1982 and February 1984, 42 new members were initiated into Local 496. None of those new members was black.

27. Between 1980 to 1985, the union accepted 54 new members of whom one was black.

*Expert Analysis of Statistics*

28. EXPERTS

As is the case with many discrimination cases brought under Title VII, expert witnesses in the form of statisticians are brought in to demonstrate that based on a statistical analysis a defendant has discriminated. Normally, each side brings in an expert who reaches opposite conclusions.

In the present case, the plaintiffs' expert is Dr. Brian F. Pendleton and the defendants' expert is Dr. Beth Martin. The un-

usual thing about these two experts is that their methodology was similar except in one major respect. This difference had to do with the beginning point or the so-called "applicant pool."

## 29. DR. PENDLETON

Plaintiffs produced an expert regarding statistics, Dr. Brian Pendleton. Dr. Pendleton used a basic standard deviation analysis on the four (4) county population figures. Based upon his analysis of these gross population figures, Dr. Pendleton concluded that there was a statistically significant underrepresentation of blacks within the membership of Local 496. In other words Dr. Pendleton, through his analysis, found that there were more than two (2) standard deviations with regard to the actual number of blacks in Local 496 as opposed to the expected number of blacks in Local 496 based on the four (4) county population data.

Dr. Pendleton stated that since approximately 93.5% of the union membership is drawn from the four-county area of Lake, Ashtabula, Cuyahoga and Geauga, this should be referred to as the applicant pool.

Next, Dr. Pendleton stated that it was appropriate to consider three separate levels of occupations. First, there was the general labor force in the broadest sense. The second occupational level is drawn from the general occupational category ("GOC") of operators, fabricators, and laborers. This general group included relatively unskilled positions like machine operators and tenders, fabricators, assemblers, etc. The third occupational level he used was the specific occupational category ("SOC") of handlers, equipment cleaners, helpers and laborers. This occupational level is very specific and includes the members of Local 496.

All of the county and occupational data are drawn from the 1980 census.

Dr. Pendleton, in effect, states that since 93½% of all of the union members come from the four counties, namely, Lake, Geauga, Ashtabula, and Cuyahoga County, these should be considered primarily. He considered the general labor force, the GOC and the SOC, and determined the percentage of blacks in those counties and in those categories and then compared it to the percentage of blacks belonging to the union. The percentage of blacks in the union, Local 496, was substantially less than the percentage of blacks in the GOC and the SOC in the relevant counties.

This is a very broad categorization and, in substance, it includes, in computing the percentages, the total of blacks and whites in the GOC and the SOC in those counties and compares it with the black/white ratio of membership in Local 496.

Based on his calculations, he concluded that blacks are consistently underrepresented in the union membership in a statistically significant manner.

Dr. Pendleton took a much broader approach than Dr. Martin.

## 30. DR. MARTIN

Dr. Martin criticized Dr. Pendleton's method in that he used the entire labor pool of the four-county area (Lake, Geauga, Ashtabula, and Cuyahoga) as the applicant pool for his analysis.

Dr. Martin, in substance, states that since Local 496 membership policy states that one must be working in Lake County at the time one applies for membership, this must be taken into consideration and that a more finely tuned applicant pool should be used, rather than the one selected by Dr. Pendleton. She agreed with Dr. Pendleton that the GOC and the SOC should be the basis of the analysis. However, she stated that the general labor force would be an inappropriate applicant pool.

In sum, she states that the appropriate labor pool consists of the individuals within the GOC and the SOC who work in Lake County, regardless of county residency. Her reason is that those are the only individuals who are eligible for membership in Local 496.

She further states that since approximately 93.5% of the union membership is drawn from the four-county area, that would be the geographical area from which

the applicant pool is derived. She used the 1980 census provided by the Northern Ohio Data Information Service ("NODIS"). It was determined that there are a total of 6,488 workers in the GOC from the four-county area who work in Lake County, and that 358 or 5.5% are black. There are 1,195 workers in the SOC from the four-county area who work in Lake County. There are 52 or 4.35% who are black. The overall work force in Lake County is 1% black. She thus concludes that the GOC is 5.5% black and 94.5% white, and the SOC is 4.35% black and 95.65% white.

Dr. Martin then goes on and uses the same methodology as Dr. Pendleton, but she ends up with a result that concludes that there is no discrimination. She then simply states that since the union membership is 5% white and the percentage of blacks in the GOC now working in Lake County is 5% blacks, there is no discrimination.

### 31. COMPARISON OF DR. PENDLETON'S & DR. MARTIN'S REPORTS

Obviously, the difference in the results is the applicant labor pool. In effect, Dr. Pendleton uses a broader base, using the entire labor force in the four-county area for overall labor pool, GOC and SOC. This results in a higher percentage of blacks and a lower percentage of whites.

On the other hand, Dr. Martin took the NODIS figures as a beginning point of 6,488 workers in Lake County in the GOC. She then took the percentages of blacks and whites who are in this category and concludes that there is no discrimination.

Dr. Pendleton, in effect, states that the applicant pool is much broader than those working at the present time in Lake County. He believes that the applicant pool should be either the GOC or the SOC for the four-county area, rather than limited to the GOC or the SOC working in Lake County. He claims that the premise upon which Dr. Martin starts, that the applicant pool should be the GOC or the SOC working in Lake County, is not proper because it is too limiting.

The weakness of Dr. Martin's argument or conclusion is that it does not take into consideration the fact that there may be discrimination in the hiring of the 6,488 employees in the GOC in Lake County. In other words, if in the hiring of all of the 6,488 employees in the GOC in Lake County there was in fact discrimination, then 5% blacks would not be a proper figure. Dr. Martin's conclusion assumes that there was no discrimination in the hiring of blacks in the GOC and, thus, her conclusion that the applicant pool is 5% black may or may not be valid.

This Court believes that the limitations of Dr. Martin's report are too many and that the basis of Dr. Pendleton's report is too broad. In other words, Dr. Martin's basis is too narrow and Dr. Pendleton's is too broad. For this Court to conclude that there is or there is not discrimination based on the conclusions of Dr. Pendleton and Dr. Martin would not be proper. While the Court will take into consideration Dr. Pendleton's and Dr. Martin's reports and conclusions, they will not control. In other words, this Court does not feel that it is proper to pick and choose between the two reports and then draw a conclusion as to whether there was or was not discrimination based on these reports.

There is much better evidence, based on the testimony and exhibits in this case, upon which this Court can base its conclusions as to whether there was or was not discrimination.

There is a cumulative combination of facts and circumstances upon which this Court can conclude whether there was or was not discrimination. These include, and are not limited to, the following:

a. The various collective bargaining agreements between the unions, employers, and employers' associations.

b. The International Union's requirement that one must be "working in the calling" before he or she may become a member of the union.

c. By custom and practice and by various agreements, the employers may hire employees as they choose, without any ac-

tive control by the union or overseeing by the union in regard to discrimination.

d. The union will admit into membership any person who has a job which means that he is in the calling.

e. The union requires that anyone who gets a job and is in the calling and is not a union member must join the union within seven days of getting the job.

f. In 1975, the union membership was 100 with 10 being black. In 1985, the union membership was 500 with approximately 20 being black. Between 1980 and 1985, 54 new members were initiated into the union or admitted into the union and one was black and all of the others were white.

g. This case is limited to hiring of laborers at the Perry Nuclear Power Plant. The hiring of laborers at the Perry Nuclear Power Plant was based on a collective bargaining agreement. This, in effect, was a closed shop arrangement.

h. The union only sends persons to an employer at the Perry Nuclear Power Plant on request by the employer. The employer may request a named individual or just ask for a certain number of persons. The union kept lists of unemployed union members, as well as unemployed non-members.

i. The union only sent unemployed members in response to requests for unspecified workers.

j. The union never sent a non-union member in response to a request for an employee.

k. Because the Perry Nuclear Power Plant was a secured area it was virtually impossible for the average applicant for a job to gain access to employers to be hired. Present union members, stewards and foremen working at the Perry Nuclear Power Plant had direct access to all of the employers and contractors working at the Perry Nuclear Power Plant, and they were able to recommend their friends and relatives for jobs. They were then in the calling and were able to become members of the union.

l. Approximately 30% of all of the union members are relatives and friends of other union members.

m. As a result of the fact that the Perry Nuclear Power Plant was a secured area and the present union members, foremen and stewards had access to the employers, a high percentage (30%) of the union members who were hired are relatives of existing union members.

### Local 496 Referral Practices

32. The Business Manager and Field Representative frequently make calls to and receive calls from the contractors and the foremen to assist union members in obtaining employment, and to assist contractors in obtaining employees. All General Foremen and Foremen working for contractors or sub-contractors pursuant to a labor agreement with Local 496 were members of that local.

33. Article VI, section 7 of the June 1, 1988—April 30, 1990 Local 496—Lake County Contractors Association Agreement provides "[m]embers of Local 496 may solicit their own jobs and Contractors may hire members of Local 496 directly. However, it is recognized within the construction industry that the Union affords a prime source of qualified workers."

34. In the collective bargaining agreement between the union and the contractors, the contractors can hire who they please but they must be a member of the union.

35. The prevalent practice in Lake County was for contractors to hire as laborers only members of Local 496. Blacks who were not members of the local would therefore not be hired.

36. If a member of the union gets hired they notify the union so it is entered on the records for dues-paying purposes.

37. When a contractor hires a non-union member he must become a member of the union within seven days or he cannot keep his job.

38. Mr. Rudy Bracale, the Field Representative for Local 496, testified that the union never sent people to a contractor for a job. However, if a contractor or employer wanted someone special they would request them.

39. When contractors would request from Local 496 that a black laborer be referred, the Business Manager of Local 496 often would call Local 860 of Cleveland to send a black laborer rather than refer a class member.

40. The language in Article VI, section 7 of the 1988–90 Lake County Contractors Association Agreement has consistently been interpreted to allow contractors to hire non-members as well as members who solicit their own jobs.

41. On occasion, contractors who have collective bargaining agreements with Local 496 have specifically requested that Local 496 refer individuals to them for jobs. On some occasions these specifically requested individuals were not members of Local 496 at the time of the contractor's request. By policy and practice, Local 496 honors these contractor requests regardless of the fact that the individual requested was not a member of Local 496.

42. In the event a non-member is referred because of a specific request by a contractor having a collective bargaining agreement with Local 496, that individual is inducted into membership and required to pay the needed initiation fee within seven days of commencing employment with the requesting contractor.

43. Any non-member of Local 496 who secures, through his or her own solicitation, a job with a contractor having a collective bargaining agreement with Local 496 is, within seven days after securing such job, inducted into membership in Local 496.

44. The union automatically admitted into membership anyone hired by a contractor or employer at the Perry Nuclear Power Plant. The union did not police the hiring practices of the employer as to whether or not there was discrimination in the hiring practices.

45. This Court did not find any express overt agreement between the contractors and the union in regard to hiring practices.

46. Prior to June 1, 1988, and at all relevant times (a) members of Local 496 as well as non-members could solicit their own jobs and employers with a collective bargaining relationship with Local 496 could hire such individuals directly; and (b) non-members who were so hired were required to become members of Local 496 within seven days pursuant to the then applicable collective bargaining agreement.

### Local 496 Referral Procedures

47. The Business Manager has total authority to refer anyone to laborer positions. During the relevant period, Mr. Conrad referred union members to jobs and refused to refer persons such as the plaintiffs, who were not union members. Local 496 never referred a non-member to a job at the Perry Nuclear Power Plant. For the period relevant to this lawsuit, blacks have been referred to well in excess of 1.3% of the job opportunities presented to Local 496 by contractors within its jurisdiction. The job referral system operated by Local 496 is non-exclusive. Any person, member or non-member, has the right to solicit his or her own job opportunities as a laborer within the territorial jurisdiction of Local 496.

48. The mechanics of maintaining a list for out-of-work members and non-members of Local 496 changed several times. There was one system in the period 1980 to 1985. There was another system in 1985 and a third system after 1987.

49. Prior to 1985, a list of unemployed members was kept on a secretary's spiral-bound stenographic pad. This list was labeled "Unemployed Members List." This was kept on a daily basis. When a union member became unemployed, he or she showed up at the union hall and signed the list. This book was kept at the counter.

50. The front of the book was used exclusively for unemployed union members. In the back of the book there was a separate sheet for non-members. This listed the non-members according to race, whether he or she was black or white.

51. Some black applicants for membership in Local 496 and for job referrals were required to sign a book which identified them by race. These applicants were not made members or referred to any laborer's position.

52. Beginning in 1985, the union maintained a single list of both union and non-union members who were looking for work. However, there was also a typewritten membership list which contained all of the unemployed members in order of layoff. Only members were on this list. Non-members were not on this list. It was the typewritten list that was used for any reference.

53. Frequently, over the years, black applicants and black union members have called or contacted the Business Manager or the union for referrals with little or no success.

54. In October of 1986, Floyd Conrad informed the union membership of a new written referral policy effective in October 1987. Under the new policy, members would be referred to job openings in the order in which their names appeared on a referral list. The list was to be maintained in this manner: those members who had last worked were to be last to be selected from the list.

55. The 1987 referral system is facially objective and non-discriminatory. It refers to "persons" exclusively rather than "members" in describing those who may avail themselves of the system. The exception to the foregoing is the declaration that "members" may use the system in the interim period between the date of the notice explaining adoption of the system and October 1, 1987, effective date of the new system.

56. In administering the referral system, each month the union's secretary prepares a new monthly list: (i) deleting those names of those individuals from the prior month's list who either (a) have not advised the union on a monthly basis that they are still looking for work or (b) have worked more than forty hours the prior month; and (ii) adding the names of those individuals who have either signed the out-of-work book or called since the last list was prepared advising the union that they are looking for work.

57. Referrals are made in the order of the list, i.e., to the person on the top of the list at the time the job becomes available who has the skills and qualifications to perform the job.

58. As late as January 1990, Mr. Conrad, other officers of Local 496, and subordinate employees have failed to instruct class members inquiring about membership or job referrals how this alleged *new* referral plan works. For instance, class members were not told that they needed to contact the local monthly in order to keep their names on the list. This had the effect of denying them opportunities to be referred to jobs.

### International Union Involvement

59. At all relevant times, the referral system was administered solely by Local 496; no International Union representative or agent has participated in its operation.

60. Since March 1985, the International Union has been a signatory to a National Maintenance Agreement that permitted defendant Local 496 as its agent to fill all laborer job vacancies at the Perry Nuclear Power Plant.

61. Article III on page 2 of the National Maintenance Agreement requires the defendant International Union "to abide by all Executive Orders and subsequent amendments thereto, regarding the Civil Rights Act of 1964, pertaining to non-discrimination in employment, in every respect."

62. Article XIX of the National Maintenance Agreement provides that a signatory employer will hire workers "in accordance with the hiring procedure existing in the territory where the work is being performed."

63. The only work performed in Local 496's jurisdiction under the National Maintenance Agreement was at the Perry Nuclear Power Plant site.

64. Since March 1985, the International Union and Local 496 have maintained a principal and agency relationship regarding the referral of both union members and class members for jobs as laborers at the Perry Nuclear Power Plant.

65. Defendant Floyd Conrad, the Business Manager for defendant Local 496, regularly informed the Regional Office of the International Union about charges or lawsuits filed by the named plaintiffs and sent copies of *all* EEOC findings, both "cause" and "no cause," to that office.

66. The former Regional Managers of the International Union, Thomas J. Arconti and Charles Sutton, sent letters to the General President of the defendant International Union containing enclosures such as NLRB charges and other documents, EEOC findings, and newspaper clippings about claims of racial discrimination and retaliation by the defendant Local 496.

67. Further, the International Union had its own arrangements with the Equal Employment Opportunity Commission ("EEOC") and the National Labor Relations Board ("NLRB") to receive directly copies of charges alleging discriminatory action by its affiliated local unions, including Local 496.

68. The defendant International Union has a legal obligation under the National Maintenance Agreement, the AFL–CIO Constitution, as well as under the Civil Rights Acts of 1866 and 1964, to insure that its local unions do not engage in unlawful discriminatory conduct.

69. The Constitutions of Local 496 and of the International Union provided the International Union with supervisory power and duties over Local 496 pursuant to which the International Union could intervene in the affairs of Local 496.

70. The International Union has the authority and control to take action to eliminate the discriminatory actions by defendant Local 496 and its employees.

71. The defendant International Union was aware of the discriminatory actions being taken by the defendant Local 496 and Floyd Conrad since May of 1983, but has continually refused to investigate charges of discrimination or take any action to correct this illegal conduct.

CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter of this action and the parties thereto by virtue of Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000e, *et seq.*, and 28 U.S.C. § 1343 for plaintiffs' claims under 42 U.S.C. § 1981. Defendant Laborers International Union of North America ("International Union") is a labor organization under 42 U.S.C. §§ 2000e(d), (e). The Lake County, Ohio affiliate of the International Union, Laborers Local 496 ("Local 496") is also a labor organization under 42 U.S.C. §§ 2000e(d), (e). Defendant Floyd Conrad is an agent of Local 496 and, as such, is also subject to liability for racial discrimination. 42 U.S.C. § 2000e(d).

2. 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), condemns as an unlawful employment practice the exclusion of persons from union membership and/or from equal participation in a job referral system by the application of higher standards to members of minority groups than to white persons because of race, color or national origin.

3. Defendants contend that plaintiffs' charges of discrimination under Title VII were not timely filed with the Equal Employment Opportunity Commission ("EEOC"). Under Title VII, a charge of discrimination must be filed with the EEOC within 180 days after the discrimination occurred. 42 U.S.C. § 2000e–5(e). Timely filing of a charge with the EEOC is a prerequisite to suit in this Court. *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982); *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). Plaintiffs must further file their complaint in this Court within 90 days after the EEOC notifies them of their right to sue. 42 U.S.C. § 2000e–5(f). The Court finds that plaintiffs' charges of discrimination were timely filed with the EEOC because defendants discriminated against plaintiffs within 180 days before they filed their discrimination charges. The Court further finds that plaintiffs timely filed their complaint in this case within 90 days after the EEOC notified them of their right to sue.

4. 42 U.S.C. § 1981 prohibits intentional discrimination in the making and enforcement of contracts. Section 1981 prohibits

intentionally discriminatory union membership and referral practices.

5. Defendants also claim that plaintiffs' cause of action under 42 U.S.C. § 1981 is barred by the applicable statute of limitations. Congress has not specified a statute of limitations period for actions under 42 U.S.C. § 1981, so this Court must apply the appropriate state statute of limitations. *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987). The Court finds that the applicable statute of limitations is Ohio's two-year statute of limitations for personal injuries under Ohio Rev.Code Ann. § 2305.10, which is applied in this Circuit in analogous actions under 42 U.S.C. § 1983. *See Browning v. Pendleton*, 869 F.2d 989 (6th Cir.1989). The Court finds that plaintiffs have proved that the defendants discriminated against them within the two years before they filed their complaint in the present case. Therefore, plaintiffs' complaint under 42 U.S.C. § 1981 was timely filed.

6. Both Title VII and 42 U.S.C. § 1981 provide relief when a union's conduct is based, at least partially, on one of the specifically forbidden factors, such as race. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *King v. Laborers Internat. U. of No. America, U.L. No. 818*, 443 F.2d 273, 278 (6th Cir.1971). Evidence of defendants' discriminatory practices occurring before the period during which class members applied for membership and/or referrals is admissible to show:

(a) defendants' discriminatory intent and the effect of their policies. *See, e.g., United States v. Local 1, Ironworkers*, 438 F.2d 679 (7th Cir.1971), *cert. denied*, 404 U.S. 830, 92 S.Ct. 75, 30 L.Ed.2d 60 (1971); *United States v. Local 86, Ironworkers*, 315 F.Supp. 1202 (W.D.Wash.1970), *aff'd*, 443 F.2d 554 (9th Cir.1971), *cert. denied*, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367;

(b) the existence of a longstanding pattern or practice of discrimination continuing to the present time, *United States v. Local 36, Sheet Metal Workers*, 416 F.2d 123 (8th Cir.1969); and

(c) that present policies or practices, facially neutral, perpetuate the effects of past discrimination, *United States v. Local 1, Ironworkers, supra; Local 189, United Papermakers v. United States*, 416 F.2d 980 (5th Cir.1969); *United States v. Local 36, Sheet Metal Workers, supra; United States v. Local No. 86, Ironworkers, supra.*

### Disparate Impact

7. Plaintiffs contend that Local 496's membership and referral practices have had a disparate impact on blacks. Proof of disparate impact gives rise to a prima facie case of discrimination under Title VII upon showing that the practices operate to exclude members of a protected class, regardless of whether the defendant intended to discriminate. The burden then shifts to the defendant to show that its practices are a business necessity. *Griggs v. Duke Power Co.*, 401 U.S. 424, 431–32, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971); *Equal Employment Opportunity Commission v. Local 798*, 646 F.Supp. 318, 325 (N.D.Okl.1986). Disparate impact is often proved through statistical evidence. *Coe v. Yellow Freight System, Inc.*, 646 F.2d 444, 450 (10th Cir.1981).

8. The practices which plaintiffs claim had a disparate impact on blacks are (1) the practice of admitting into the union only persons who are "in the calling" and (2) the practice of referring only union members for jobs.

9. The relevant geographic area for purposes of comparison of the labor force with the membership of Local 496 is the four-county area from which the union draws the majority of its members, not only the county over which the local has jurisdiction. *EEOC v. Local 14 International Union of Operating Engineers*, 553 F.2d 251 (2d Cir.1977). The four-county area is comprised of Lake, Ashtabula, Cuyahoga and Geauga counties.

10. Local 496's membership and referral policies have resulted in a disproportionately small percentage of black union members as compared to the relevant labor

force. Plaintiffs' statistical evidence shows a gross disparity between the percentage of blacks in the membership of Local 496 and the labor force of the four-county area, both in terms of total number of members during the relevant period and in terms of the new members taken in during this period.

11. The statistical disparities are sufficient to establish a *prima facie* case of discrimination under the disparate impact theory. In addition, other evidence of discriminatory treatment of class members supports the statistical evidence and together the evidence raises an inference of intentional discrimination. *Ingram v. Madison Square Garden*, 482 F.Supp. 414 (S.D.N.Y.1979), *aff'd*, 709 F.2d 807 (2d Cir. 1983).

12. It is unlawful discrimination for a union to apply qualifications which have a racial impact and are unrelated to successful job performance or business necessity. *See e.g., Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *United States v. Jacksonville Terminal Co.*, 451 F.2d 418 (5th Cir.1971), *cert. denied*, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972); *EEOC Guidelines on Employee Selection Procedure*, 29 C.F.R. 1607.1, *et seq*.

13. When a union has engaged in racially discriminatory practices and exercises substantial control over construction job opportunities, it cannot require minority workers to be working in the trade if the union's own work referral policies have kept blacks from obtaining work in the trade. This experience requirement perpetuates the effects of past discrimination and constitutes present unlawful discrimination. *See, e.g., United States v. Bethlehem Steel Corp.*, 446 F.2d 652 (2d Cir.1971); *Local 189, United Papermakers v. United States*, 416 F.2d 980 (5th Cir.1969), *cert. denied*, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970); *United States v. Local 36, Sheet·Metal Workers*, 416 F.2d 123 (8th Cir.1969).

14. Defendants here have failed to produce sufficient evidence of a job-related business justification for the membership and referral policies that have a disparate impact on blacks. The "working-the-calling" rule offered by the local as justification cannot justify the extreme adverse impact, since even if applied in a nondiscriminatory fashion, it simply works to reinforce past patterns of discrimination. *See, e.g., Gibson v. Local 40, Supercargoes & Checkers*, 543 F.2d 1259 (9th Cir.1976).

15. The union has failed to offer any justification for its policy of not referring non-members of the union for laborers' jobs. This policy is contrary to the union's agreement with the Perry Plant contractors and to the National Labor Relations Act (29 U.S.C. § 158(b)(1)(A)). In addition, this practice has the effect of discriminating against blacks.

16. Even if the "working-the-calling" rule offered by Local 496 as justification for the statistical underrepresentation of blacks in the union were deemed sufficient to satisfy its burden of production of a business justification, plaintiffs have proven the existence of a less restrictive alternative: the Local could have referred plaintiffs to jobs and then allowed them to join the union. This is the policy that the contract with the Perry Plant called for and is the policy the Local claims to have put into effect in 1987, presumably without violating its constitution.

### Disparate Treatment

17. The plaintiffs are claiming that they were treated differently than other white applicants for union membership and referral to jobs by Local 496 and Floyd Conrad because of their race. Thus, plaintiffs are also proceeding under a disparate treatment theory. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

18. Disparate treatment involves intentional discrimination. Proof of discriminatory motive is necessary. Discriminatory motive can be inferred from the fact of difference in treatment. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977).

Intentional discrimination through disparate treatment violates both Title VII and 42 U.S.C. § 1981. *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 669, 107 S.Ct. 2617, 2625, 96 L.Ed.2d 572 (1987).

19. Under *McDonnell Douglas Corp. v. Green, supra,* the United States Supreme Court established a test to prove a *prima facie* case of discrimination. The plaintiffs may meet their initial burden by showing: (1) that they belonged to a racial minority; (2) that they applied and were qualified for a job or union membership; (3) that they were rejected for the position and/or union membership; and (4) that a white person was referred to the job and/or became a member of the union. *McDonnell Douglas Corp., supra,* 411 U.S. at 802, 93 S.Ct. at 1824.

20. The plaintiffs carry the initial burden of establishing a *prima facie* case of racial discrimination under this disparate treatment analysis. If they succeed, the burden then shifts to the defendant to propound a legitimate reason for its action. *McDonnell Douglas Corp. v. Green, supra,* at 802, 93 S.Ct. at 1824; *Dickerson v. United States Steel Corp.,* 439 F.Supp. 55, 75 (E.D.Pa., 1977). This reason must be based on admissible evidence showing a specific legitimate, non-discriminatory basis for the challenged action. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254–58, 101 S.Ct. 1089, 1094–96, 67 L.Ed.2d 207 (1981). The reason cited must be tested against facts known to the defendant at the time of its action. Post hoc rationalizations, however persuasive, will not suffice. *Williams v. TWA,* 660 F.2d 1267 (8th Cir.1981). *See, generally,* Belton, *Burdens of Pleading and Proof in Discrimination Cases,* 34 Vand.L.Rev. 1205 (October 1981).

21. The order of proof under *McDonnell Douglas Corp. v. Green, supra,* allows for one additional step. Assuming that the plaintiff has made out a *prima facie* case of discrimination which has been rebutted by the union's demonstration of a legitimate non-discriminatory reason for the challenged action, plaintiffs must then be afforded a "fair opportunity to show that the justification offered by the defendant was in fact pretext." 411 U.S. at 804, 93 S.Ct. at 1825. A showing of pretext does not require that the plaintiff conclusively demonstrate that the factors articulated by the defendant were wholly irrelevant to the challenged practice and that race was the *sole* causative factor. Rather, it is sufficient to demonstrate that, regardless of the validity of the defendant's assertions, race was *one* cause. *McDonald v. Santa Fe Trail,* 427 U.S. 273, 282 n. 10, 96 S.Ct. 2574, 2557 n. 10, 49 L.Ed.2d 493 (1976).

22. Plaintiffs have met their initial burden of proof based on a disparate treatment analysis. The evidence introduced shows that: (1) the plaintiffs are black; (2) they were available for referral by the union for job opportunities at the Perry Nuclear Power Plant and to become a member of the union; (3) they did not receive referral for the many job opportunities despite the fact that they should have been referred according to the referral policy the union was supposed to follow; and (4) white non-members were referred to jobs to which plaintiffs had applied and were made members of Local 496.

23. It is a violation of Title VII and § 1981 for a union to engage in practices that have the effect of discouraging minority applicants from applying for employment in the trade. *United States v. Local 86, Ironworkers, supra.* Specifically, it is unlawful for a union to give false, misleading or incomplete information to minority persons. In addition, it is unlawful for a union to fail or refuse to inform minorities of work opportunities or of the procedures for membership application, referral, or apprenticeship training. *United States v. Local 86, Ironworkers, supra.* The evidence in this case demonstrates that minority persons were not informed of Local 496's procedures for membership and referral for jobs.

24. It is unlawful for a virtually all white union to give preference with regard to union membership or work referral opportunities to union members and

their friends and relatives, by relying on word-of-mouth dissemination of information or otherwise. *Parham v. Southwestern Bell Tel. Co.,* 433 F.2d 421, 425 (8th Cir.1970); *United States v. Local 36, Sheet Metal Workers, supra.* The evidence in the record shows a pattern and policy of favoritism to friends and relatives. Such a practice is almost inherently discriminatory. *United States v. Wood, Wire & Metal Lath. Int. Union, Local 46,* 328 F.Supp. 429, 436 (S.D.N.Y.1971). *See also, United States v. Bricklayers Local No. 1,* 5 E.P.D. ¶ 8480, 1972 WL 240, (W.D.Tenn.1972), *aff'd,* 497 F.2d 871 (6th Cir.1974).

25. The union has failed to offer any justification for its policy of not referring non-members of the union for laborers' jobs. This policy is contrary to the union's agreement with the Perry Plant contractors and to the National Labor Relations Act (29 U.S.C. § 158(b)(1)(A)). In addition, this practice has the effect of discriminating against blacks.

### Conclusion

26. In view of the Findings and Conclusions, plaintiffs have sustained the required burden of proof in establishing that Local 496 and Floyd Conrad have engaged in a pattern or practice of discrimination which constitutes an unlawful employment practice in violation of 42 U.S.C. §§ 2000e–2(a), (c), and 42 U.S.C. § 1981.

### International Union Liability

27. The International Union can be held liable under two different legal theories. First, it can be held liable for the acts of Local 496 and Floyd Conrad if Local 496 was acting as agent of the International Union. Second, the International Union can be held liable if it has violated an affirmative duty under Title VII and § 1981 to oppose discriminatory practices of Local 496. *Berger v. Iron Workers Reinforced Rodmen Local 201,* 843 F.2d 1395 (D.C.Cir.1988), *cert. denied,* 490 U.S. 1105, 109 S.Ct. 3155, 104 L.Ed.2d 1018 (1989).

28. Under the agency theory, the International Union can be liable for the actions of the local union if Local 496 acted as the agent of the International Union. Therefore, the Court must first decide whether an agency relationship existed. The test to determine whether an agency relationship exists is essentially one of balancing the character of the business affairs subject to the International's control and supervision against those left to the discretion of the local. *Berrigan v. Greyhound Lines, Inc.,* 560 F.Supp. 165, 169 (D.Mass. 1982). A court should look at such factors as internal management, contract negotiation and the constitutions of the two organizations. *Berrigan,* 560 F.Supp. at 168; *Berger,* 843 F.2d at 1430.

29. A principal may be held liable for the intentional acts of its agent if the agent's conduct is within the scope of its agency and if, with knowledge of the conditions, the principal intends the conduct or intends the consequences. *Berger,* 843 F.2d at 1430; *Restatement of Agency 2d,* Section 1 (1958). Thus, the International Union may be held liable on the class claims if, with knowledge of the surrounding circumstances, it authorized, ratified, approved or acquiesced in the local's actions, the effects of which are sufficient to establish a claim of intentional discrimination against Local 496. *Berger v. Iron Workers Reinforced Rodmen Local 201,* 843 F.2d 1395 (D.C.Cir.1988); *Farmer v. ARA Services,* 660 F.2d 1096, 1104 (6th Cir.1981); *EEOC v. Detroit Edison Co.,* 515 F.2d 301, 314 (6th Cir.1975).

30. Because the Court finds that the International Union was aware of the discriminatory actions of Local 496 and Floyd Conrad both before and after March 1985 regarding refusing to make referrals to class members or permitting them to become union members and further finds that the International Union acquiesced in those actions, the Court finds for class members in their claims against the International Union.

31. A labor organization in some circumstances has an affirmative duty to oppose discriminatory practices of its affiliated locals. Whether an affirmative duty

exists depends on whether there was a substantial connection between the International Union and the local such that the International Union would both know of the discriminatory practices and be expected to intervene to oppose them. *Kaplan v. Intern. Alliance of Theatrical, etc.,* 525 F.2d 1354, 1360 (9th Cir.1975).

32. The International Union had been on notice for many years of the class member charges of discrimination against the local and of the reasonable cause findings that had been issued by the EEOC. Furthermore, the International Union was a party to the contract regulating labor relations at the Perry Nuclear Power Plant, the largest source of employment of Local 496 members during the relevant period. The Court finds that the International Union had an affirmative duty to oppose the discriminatory practices of Local 496, and that it breached its duty by failing to take any corrective action.

33. Based upon the foregoing Findings and Conclusions, plaintiffs have sustained the required burden of proof in establishing that the International Union is liable for the acts of Local 496 and Floyd Conrad and in establishing that the International Union violated an affirmative duty under Title VII and § 1981 to oppose discriminatory practices of Local 496.

34. Defendants Local 496, Floyd Conrad, and the International Union are liable for violations of 42 U.S.C. §§ 2000e and 1981.

35. This case was bifurcated, first, to try the issues of liability, and then, if there was liability as against any of the defendants, the case would proceed to trial on the issue of damages. Inasmuch as each defendant has been found liable to plaintiffs, this case will proceed to trial on the issue of damages.