Art TOMBLIN, et al., Plaintiffs,

v.

LOCAL 496, LABORERS' INTERNA-
TIONAL UNION OF NORTH
AMERICA, Defendant.

No. 1:94–CV–1705.

United States District Court,
N.D. Ohio,
Eastern Division.

March 26, 1998.

---

Edward G. Kramer, Kramer & Nierman, Cleveland, OH, for Plaintiffs.

Alan S. Belkin, Law Offices Of Alan S. Belkin, Cleveland, OH, for Defendant.

### MEMORANDUM & ORDER

O'MALLEY, District Judge.

For the reasons stated below, the Court rules as follows: (1) the Court's Order dated February 28, 1996, is **VACATED;** and (2) defendant's motions for summary judgment (docket nos. 28 & 45) are both **GRANTED,** and this case is **DISMISSED.**

### I.

This case returns to this Court on remand from the Sixth Circuit Court of Appeals. Earlier, defendant Local 496, Laborers' International Union of North America ("Local 496") filed a motion for summary judgment, which this Court granted. Plaintiffs Art

Tomblin and Ronald Colvin appealed this Court's Order, but the Sixth Circuit Court of Appeals dismissed the appeal and remanded the case to this Court for further proceedings. The Sixth Circuit noted:

> Plaintiffs' complaint included two claims. First, they alleged that defendant retaliated against them for filing charges of racial discrimination against it with the Equal Employment Opportunity Commission, and second, they alleged racially discriminatory employment practices. Both claims were predicated upon 42 U.S.C. § 2000e *et seq.*
>
> Although the district court's order purports to grant judgment to defendant on all claims, we note that defendant's memorandum of law in support of its motion for summary judgment did not address plaintiffs' retaliation claim, and that the district court's Memorandum Opinion, filed February 28, 1996, also does not address that claim. Because the district court's entry of summary judgment cannot be said to encompass all claims, we are in no position to review this partial grant of summary judgment.

Slip op. at 1–2 (May 16, 1997). The Court of Appeals then remanded the case for further proceedings.

Following the appellate court's remand, this Court directed the parties to file motions for summary judgment regarding the retaliation claim, if appropriate. Local 496 filed a second motion for summary judgment (docket no. 45), which the plaintiffs opposed. The additional briefing regarding plaintiffs' *retaliation* claim revealed (or at least made far more clear) important facts regarding plaintiffs' *discrimination* claim, which the parties had not set out in their earlier briefs. The Court concludes that the revelation of these additional facts makes it appropriate to examine anew defendant's first motion for summary judgment.

Accordingly, the Court hereby **VACATES** its Order dated February 28, 1996, and addresses both of defendant's motions for summary judgment, below.

## II.

### A. General Background.

This case was transferred to the docket of the undersigned, as related to *Alexander v. Local 496, Laborers' Int'l Union of N. America*, 655 F.Supp. 1446 (N.D.Ohio 1987) (appeal pending). *Alexander* is a class action suit filed by African–Americans who applied for membership in Local 496, alleging racial discrimination. In 1991, Judge Krenzler held a bench trial on the question of liability only and found that Local 496 had engaged in racially discriminatory practices. *Alexander*, 778 F.Supp. 1401 (N.D.Ohio 1991). Judge Krenzler further found that both Local 496 and the International Union ("LIUNA") were liable.[1] The gist of Judge Krenzler's finding was that the Union's requirement that applicants already be "in the calling" (i.e., be actively employed by a Union contractor) before they could become either Union members, or eligible for placement on the Union's job referral list, worked to exclude African–Americans from ever getting jobs "in the calling" in the first place. More specifically, Judge Krenzler found that nuclear power contractors looked only to the Union's job referral list when filling employment vacancies, making illusory any possibility that workers could solicit positions directly from the contractors. Judge Krenzler concluded that the Union's exclusion of nonmembers from its job referral list ensured that contractors would hire only those workers whom the contractors had previously employed (and who, thus, became eligible to join the Union), or workers who "knew someone" at the Union. Because the ranks of nuclear power workers (and, thus, Union members) were historically mostly white, Judge Krenzler found the Union's rules regarding Union membership and job referrals had a racially discriminatory effect.

Judge Krenzler found the Union's practices were illegal even though, in 1987, the Union had changed its job referral list rules to permit participation of non-Union mem-

---

1. The defendants in *Alexander* included both Local 496 and LIUNA, while the only defendant in this case is Local 496. The Court sometimes refers in this opinion to Local 496 and LIUNA, collectively, as "the Union."

bers. Specifically, in 1987, a non-minority, non-Union worker filed an unfair labor practice charge against the Union; in response, the Union agreed to include non-Union members on its job referral list. This agreement had the effect of opening up the Union's referral list to all non-Union members, regardless of race. While Judge Krenzler did not explain why he felt the 1987 rule change did not moot the *Alexander* plaintiffs' claims, it appears he may have felt that way both because the plaintiffs' damages partially predated the 1987 rule change and because the Union did not make the rule change widely known to minority workers or otherwise encourage minority participation in the job referral process. *See, e.g., United States v. City of Warren*, 759 F.Supp. 355 (E.D.Mich. 1991), *aff'd in part and rev'd on other grounds on appeal*, 138 F.3d 1083 (6th Cir. 1998) (a case is not mooted by the voluntary cessation of a challenged practice when interim events do not completely eradicate the effects of the alleged violation).

After Judge Krenzler found the Union liable for racial discrimination in *Alexander*, he certified that an immediate appeal could materially advance the ultimate termination of the litigation, pursuant to 28 U.S.C. § 1292(b). The Sixth Circuit denied the parties leave to pursue an interlocutory appeal, however, so the parties turned to the damages phase of their case.[2] The parties then settled the question of the amount of damages, but the Union retained the right to appeal the question of liability. That appeal is now pending.[3]

After Judge Krenzler filed his *Alexander* opinion, the Union responded by encouraging members of the *Alexander* plaintiff class to sign up on Local 496's job referral list. In February of 1992, however, Local 496 decided to charge Union non-members a $14

monthly fee for placement on the list. The plaintiffs in this case then filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), claiming that: (1) the $14 monthly fee was yet an additional effort on the Union's part to make it difficult for African–Americans to participate in the Union's job referral process and to get jobs, and (2) the $14 fee was instituted in retaliation for the plaintiffs' victory in the *Alexander* case. By April of 1992, after only one month of charging the fee, Local 496 dropped the monthly fee requirement. The EEOC issued a "right to sue letter," and plaintiffs filed this case on August 19, 1994.

Local 496 has filed a motion for summary judgment on plaintiffs' discrimination claim (docket no. 28), and also a motion for summary judgment on plaintiffs' retaliation claim (docket no. 45). Because the Court finds that the defendant's motions are both well-taken, the motions are granted and this case is dismissed.

### B. Undisputed Facts.

The following material facts are not in dispute.[4] As noted above, since 1987, Local 496 has maintained a set of rules governing the operation of its job referral list system, and it applies those rules to both Union and non-Union members alike. These rules have been challenged and upheld, essentially receiving the approval of both Judge Manos and the National Labor Relations Board, who both found, in separate proceedings, that the rules were non-discriminatory. *See Robinson v. Laborers' Int'l Union of N. America*, Case No. 91–CV–1457 (Order dated Aug. 26, 1992) (outlining the referral system and finding it was not racially discriminatory).

Simplifying slightly, the referral list rules worked as follows. A person seeking refer-

---

**2.** Judge Avern Cohn of the Eastern District of Michigan oversaw the damages phase of the litigation. Faced with the potential of fifty-four separate damages trials in which individual issues of damages, qualifications, and mitigation would need to be resolved, Judge Cohn, with the input of the parties, structured a mechanism by which he would conduct a "prototype" damages trial. The Judge's hope was to use the lessons of a first, representative damages trial to inform further settlement negotiations or, if necessary,

the remaining damages trials. On the eve of that first damages trial, the parties agreed to a resolution of all damage issues.

**3.** See Sixth Circuit Court of Appeals consolidated case no. 96–3806.

**4.** These facts are reflected in the record in *this* case only. The Court makes no determination regarding the evidence—or law—relevant to *Robinson, Alexander*, or any other case.

ral to employment was obligated to contact Local 496 once each month, either in person or by telephone, indicating they were currently unemployed and available for work. With the first call to Local 496, the job-seeker would be placed at the bottom of a referral list. When jobs became available, Local 496 would refer persons on the list, in order. Each month, the list would be updated, with persons who had been successfully referred and persons who had received alternative employment removed from the list. In a further effort to keep the list current, persons still on the list were required to timely call Local 496 *each month* to stay on the list; these persons would move up the list until they were finally referred. If a person failed to call on any given month, however, he would be removed from the list, on the assumption that he was no longer available for current employment. Once removed from the list for any reason, a person who again sought a job referral through the Union would have to "start over" at the bottom of the list.

Plaintiffs Tomblin and Colvin first sought to be placed on Local 496's job referral list in January of 1990. At that time, the Union's earlier 1987 rule change allowed non-members to participate on the list, as long as they did so in accordance with the scheme outlined above. Tomblin and Colvin were placed on the referral list at positions 92 and 93, respectively. Both Tomblin and Colvin visited the Union hall later that month, and thus were moved up the list so that they occupied positions 65 and 66 in February of 1990. Neither Tomblin nor Colvin contacted the Union the next month, however, and thus were dropped from the job referral list in March of 1990. Tomblin and Colvin did not seek to participate in the job referral list for another two years.

In early 1992, shortly after Judge Krenzler found LIUNA and Local 496 liable for race discrimination in *Alexander*, LIUNA responded by encouraging the *Alexander* plaintiff class members to sign up on Local 496's job referral list. Some time later, on February 12, 1992, Local 496 had two meetings— one for the general membership, and one for the executive committee—to discuss the *Alexander* opinion and LIUNA's response. At the general membership meeting, a Union member made a racially derogatory remark; he was immediately admonished for doing so.[5] At the executive meeting, Local 496 elected to charge non-members a $14 monthly fee for placement on the job referral list, beginning on March 1, 1992. Full membership dues for Local 496, at that time, were $13 per month.[6] Local 496 states it decided to impose the $14 monthly fee on non-members because: (1) it sought to equalize the costs of operating the job referral list for all persons who used it, Union member and non-member alike; and (2) it believed that, as a result of the *Alexander* ruling, it would soon receive requests from many non-members for placement on its job referral list, and it wanted to defray the expected increase in its list maintenance expenses.[7]

Tomblin and Colvin sought to be placed on the referral list in March of 1992. When they did so, each knew they would be asked to pay the newly-instituted $14 monthly listing fee. Colvin paid the fee and was placed on the referral list; Tomblin did not pay the fee and was not listed. Tomblin and Colvin then filed a complaint with the EEOC regarding imposition of the $14 monthly charge. When LIUNA learned of the EEOC complaint, it immediately ordered Local 496 to repeal its imposition of the $14 monthly fee on non-members.[8] Thus, Local 496 did

---

5. At the meeting, counsel for Local 496 explained the *Alexander* ruling to the general membership. Many members apparently responded with the sentiment that this ruling was unfair. During the discussion, one member stated "we don't need the niggers taking our jobs." After a hush, the Local 496 business agent responded, "we don't talk like that in our Union meetings." No other racial comments were made.

6. Full membership dues were later raised to $14 per month, effective January of 1993.

7. The $14 monthly fee applied to any non-member, regardless of race. In March of 1992, six non-members paid the new $14 listing fee; five were white, and the sixth was plaintiff Colvin.

8. LIUNA wrote a letter to Local 496 conceding the legality of charging non-members a fee for the use of Local 496's referral system. LIUNA also stated "it may be that the referral fee was adopted in a procedurally proper manner and for perfectly legitimate reasons." LIUNA continued, however, that "it [is] possible to do a lawful act

not attempt to charge a listing fee to non-members for placement on the job referral list after March of 1992.

After the monthly fee was rescinded, Tomblin sought placement on the job referral list for the month of April, 1992. He encountered no problem in obtaining a place on the list; nonetheless, he did not take any continued action to maintain a place on the list after April of 1992. As for Colvin, despite having paid the $14 fee the month before, Colvin did not seek to maintain his position on the referral list after March of 1992, when listing was free. Because Colvin and Tomblin never remained on the referral list for a sufficient length of time during this entire period, they never rose high enough on the list to become eligible for referral.

### III.

Before turning to the pending motions for summary judgment, the Court must first define what is properly before it in this action, and what is not. This is necessary because plaintiffs apparently seek to relitigate some of the matters which were addressed and resolved by members of this Court in previous actions, and also because plaintiffs press for relief in this case which the Court has no authority to provide.

The plaintiffs discuss in some detail in their brief various Union practices that they believe denied them a fair opportunity to obtain jobs at nuclear facilities over the years. All of the practices about which plaintiffs complain, save one, however, have been the subject of prior litigation. Thus, plaintiffs point to their inability to join the Union or participate meaningfully on the Union's job referral list because of Union rules and practices which tended to exclude (or discourage) non-Union members from participating in the traditionally all-white field. And, plaintiffs assert that Union rules requiring regular (i.e., monthly) contact with the Union to stay on the Union's job referral list place an onerous or undue burden on non-Union members and particularly on minori-

ties. The first of these complaints was the subject of the *Alexander* litigation and continues to be the subject of the remedial relief ordered in that litigation. The second was the precise subject of the *Robinson* litigation and is governed by the determination in that case rejecting the notion that the post–1987 job referral rules are discriminatory. This Court cannot and will not revisit the determination in *Robinson,* and it cannot allow plaintiffs to use this litigation to expand the relief granted (or agreed to) in *Alexander.*[9] The only allegedly illegal act which is properly before this Court is the imposition and maintenance of a $14 monthly listing fee—an act which plaintiffs claim was both discriminatory and retaliatory.

■ An additional limitation on the matters properly before this Court must also be noted. The plaintiffs' complaint purports to seek *both* injunctive relief (prohibiting use of the fee) and monetary damages (compensatory and punitive damages, as well as attorney fees). As of the filing of the complaint, however, the allegedly illegal practice upon which plaintiffs' cause of action is premised no longer existed. The $14 fee was in place for one month and one month only—March of 1992. Local 496 voluntarily ceased that practice by no later than April 1992—long prior to the filing of plaintiffs' complaint in this Court. Accordingly, there exists no ongoing harm which an order from this Court could enjoin and, hence, no controversy which injunctive relief could redress. And, there was no such harm or controversy in existence when the complaint was filed in 1994. The Court proceeds on the assumption, therefore, (as Article III of the Constitution requires it must) that the plaintiffs' complaint seeks monetary damages only. *See Steel Company v. Citizens for a Better Environment,* 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("Because respondent alleges only past infractions ..., and not a continuing violation or the likelihood of a future violation, injunctive relief will not re-

---

for an improper reason," and concluded that, in light of the recent *Alexander* opinion, "it is in the best interests of all concerned" for Local 496 to discontinue charging fees of non-members.

9. Plaintiffs' counsel in this case was counsel of record in *Alexander* and was involved in the *Robinson* matter as well.

dress its injury" and the redressability prong of Article III's standing requirement cannot be satisfied); *O'Shea v. Littleton,* 414 U.S. 488, 495–96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects.")

With these jurisdictional and jurisprudential limitations in mind, the Court turns to the pending motions.

## IV.

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law....

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.... The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.,* 909 F.2d 941, 943–44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252, 106 S.Ct. 2505.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir. 1989) (citing *Frito–Lay, Inc. v. Willoughby,* 863 F.2d 1029, 1034 (D.C.Cir.1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus,* 801 F.Supp. 1, 4 (S.D.Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

## V.

### A. *Plaintiffs' Discrimination Claim.*

In order to prevail on their claim of racial discrimination, plaintiffs must satisfy the burdens of proof outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To avoid summary judgment, plaintiffs must first make out a prima facie case of race discrimination. To make out a prima facie case, a plaintiff must demonstrate that: (1) he was a member of a protected class; (2) he was subjected to an adverse employment action; (3) he was qualified for the job; and (4) he was treated differently than similarly-situated non-minority employees for the same or similar conduct. If the plaintiff successfully proves a prima facie case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. Once the employer carries this burden, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reasons offered by the employer were not its true reasons, but were a pretext for discrimination. *See Ang v. Procter & Gamble Co.*, 932 F.2d 540, 548 (6th Cir.1991) (outlining the shifting burdens in a race discrimination case).

In this case, plaintiffs do not carry their burden of establishing the second prong of their *prima facie* case—that Local 496 subjected them to an adverse employment action. Plaintiffs seem to assert, variously, that the adverse employment action arose because the fee: (1) effectively deprived them of a place on the job referral list during March of 1992 and, thus, of an equal chance to receive a referral; or (2) imposed a financial burden on them that they should not have had to shoulder.

#### 1. *Participation on the Job Referral List*

Plaintiffs assert that the $14 fee deprived them of an equal opportunity to obtain placement on or to move up the job referral list.

The problem with plaintiffs' contention, however, is that the undisputed facts show that neither Tomblin nor Colvin ever remained on the referral list long enough to have a meaningful chance for a referral *and* that the $14 fee had no impact on their referral status.

This is not a case in which a plaintiff was on the job referral list prior to March 1992 and lost his position on the list due to his inability to shoulder the $14 fee.[10] This is also not a case in which a plaintiff was delayed in getting on the list by virtue of the fee, and was thus deprived of a better position in later months during which he or she remained on the list.[11]

Quite simply, these plaintiffs were not on the list *prior* to March, 1992 and did not remain on the list for any substantial period *after* March, 1992, and neither of those facts can be attributed to the $14 monthly fee. Thus, while it is true that neither plaintiff moved up the list and became eligible for a job referral, it is equally true that it was not the $14 fee which caused that result. Colvin was not on the list as of February, 1992, though he obviously knew what the rules for participation were and had been on the list previously. He, thus, cannot complain of being bumped from the list. And, while he paid the fee to get on the list in March 1992, he chose not to remain on the list once the fee was lifted—thereby preventing himself from moving up or improving his eligibility ranking. Similarly, Tomblin failed to maintain his eligibility before March 1992 and allowed himself to be dropped off the list after April 1992. Because it is undisputed that a one or two month presence on the list would have been insufficient to put one in a position to receive a referral, neither Colvin nor Tomblin can claim that the one month fee adversely affected their employment status.

Plaintiffs attempt to skirt their own failure to remain on the referral list by claiming they did not make the required monthly calls to Local 496 because: (1) they were afraid

---

**10.** In such circumstances, a plaintiff could seek lost wages for the period during which his job referral was delayed by the need to "start over" after March 1992.

**11.** In such circumstances, a plaintiff could seek lost wages for the period of time during which his job referral was delayed by the need to wait until April of 1992 (rather than March of 1992) before being first placed on the list.

that if they participated in the referral list system after the *Alexander* decision, they would be physically harmed; and (2) signing up on the referral list would have been a futile act in any event. The Court concludes that, based on the evidence presented, even when viewed in the light most favorable to plaintiffs, no reasonable jury could conclude that these excuses justify plaintiffs' failures to maintain their places on the job referral list.[12]

▮ The first of these excuses—that plaintiffs were afraid they would suffer physical harm if they signed up on the list—is not borne out by the undisputed facts. Shortly after Local 496's general membership meeting on February 12, 1992, plaintiffs learned a Union member had made a racist comment at the meeting. Plaintiffs claim this racist comment made them fear that, if they did seek placement on Local 496's referral list, they would be physically harmed by Union members. This contention, however, is belied by the fact that plaintiffs actually *did* seek placement on the March and April 1992 referral list and obtained it without adverse consequences. Moreover, any alleged fear has nothing to do with Local 496's imposition of the $14 monthly fee: the undisputed facts reveal that plaintiffs' asserted fear of physical harm stems only from the one member's scurrilous epithet; the basis for plaintiffs' alleged fear is independent of whether the $14 monthly fee existed.[13] Also, this Court cannot conclude that an isolated comment by a Union member—who is not a Union officeholder and who was chastised immediately after his comment was made—translates to threat of physical harm from the named defendant itself. Isolated incidents of racial epithets simply are not sufficient to establish a claim of race discrimination. *Gagne v. Northwestern Nat'l Ins. Co.*, 881 F.2d 309, 315–16 (6th Cir.1989); *Erebia v. Chrysler Plastic Prods. Corp.*, 772 F.2d 1250, 1254 (6th Cir.1985), *cert. denied*, 475 U.S. 1015,

106 S.Ct. 1197, 89 L.Ed.2d 311 (1986). There is no evidence that Local 496 gave plaintiffs any basis for fear of physical harm if they participated on the job referral list. Indeed, the plaintiffs both obtained placement on the job referral list in 1990 without incident, even visiting the Union hall to do so, and neither asserts that they met with any resistance in getting on the list during March or April of 1992. Given the undisputed facts, plaintiffs' assertion that they were afraid of physical harm if they participated on the job referral list does not serve to overcome their failure to make out a *prima facie* case.

▮ Plaintiffs' second excuse of futility also fails, as a matter of law. Plaintiffs cite *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), and argue that their failure to obtain and maintain a place on the job referral list is excusable because it would have been a futile act in any event. This excuse fails simply because plaintiffs do not carry their burden of creating a material issue of fact on the question of futility, as outlined in *Teamsters*. To show futility, plaintiffs must carry "the not always easy burden of proving that [they] would have applied for the job had it not been for [Local 496's] practices." *Id.* at 368, 97 S.Ct. 1843. Plaintiffs do not even attempt to carry this burden, and the undisputed facts show they cannot. As noted, after the single month that the $14 fee was imposed, Colvin took no action to maintain his position on the job referral list. Tomblin obtained placement on the list after the $14 fee was rescinded, but never maintained his position thereafter long enough to obtain an actual job referral. Neither plaintiff has presented *any* evidence to suggest that if they had actually maintained their positions on the list long enough to obtain a referral, the Union would not have given them one. Moreover, plaintiffs' simple invocation of Local 496's "history" of discrim-

---

12. Plaintiffs made their futility argument in a response brief that was not timely filed. Nonetheless, the Court addresses the argument here. Plaintiffs also suggest a third reason for not making the required monthly calls to Local 496: the $14 monthly fee deterred them from doing so. As discussed below in section IV.A.2 of this opinion, this excuse also does not justify plain-

tiffs' failures to maintain their places on the job referral list.

13. Any fears premised solely on the Union's past practices were addressed in *Alexander* and were the subject of the remedial order in that action.

inatory policies, as evidence of futility, is unavailing, especially because Judge Krenzler's then-recent ruling made it highly unlikely Local 496 would refuse to refer plaintiffs to jobs simply because it wanted to adhere to historical practice.

Thus, the undisputed facts reveal that the Union never referred Tomblin or Colvin to a job opening only because neither plaintiff ever became eligible for a referral. This ineligibility was a result of plaintiffs' own inaction; that they never received a referral cannot be called an adverse employment action positively taken by Local 496. Because plaintiffs cannot show that Local 496 subjected them to an adverse employment action by virtue of never giving them a job referral or delaying their receipt of such referral, plaintiffs fail to make out a prima facie case.[14]

### 2. *Having to Pay the $14 Monthly Listing Fee.*

Alternatively, plaintiffs suggest Local 496 subjected them to an adverse employment action when Local 496 required that they pay a $14 monthly fee to obtain a place on the job referral list. The undisputed facts show, however, that the short-lived fee did not have any adverse impact upon either Tomblin or Colvin.

As noted above, Tomblin never paid the fee and, thus, suffered no financial consequences from its existence. And, because, as noted above, his own actions cut off any consequences which might have flowed from not participating on the list in March 1992, Tomblin's contention that the $14 fee had any impact on him—out-of-pocket or otherwise—must be rejected.

■ Colvin's claim of financial hardship is also unpersuasive. It is undisputed that the $14 fee did not deter Colvin—he paid it and received placement on the referral list. Colvin offers nothing to show that this short-lived fee imposed *any* financial hardship upon him, and certainly offers nothing to justify the conclusion that it posed a hardship which this Court could characterize as a material adverse change in his employment conditions. "[A] materially adverse change in the terms and conditions of employment must be mere disruptive than a more inconvenience or an alteration of job responsibilities." *Crady v. Liberty Nat. Bank & Trust Co. of Indiana,* 993 F.2d 132, 136 (7th Cir. 1993). Absent a real, factually supported adverse effect, Colvin's claim under Title VII cannot stand.

In reaching this conclusion, the Court notes that Colvin attests the $14 fee created a financial hardship for "many of" the members of the *Alexander* plaintiff class. But neither he nor Tomblin are willing to state that the fee created a financial hardship *upon them,* such that the fee actually deterred *them* from obtaining or maintaining placement on the list or made it personally difficult for them to do so. While some other worker might be able to show the financial burden of the $14 fee was so great that it actually deterred him from obtaining or maintaining a position on the list, or imposed a personal hardship on him or his family, neither Tomblin or Colvin adduce any evidence suggesting the short-lived fee actually had any adverse effect on them.[15] To the contrary, the only evidence presented is that plaintiffs dropped off the referral list for reasons other than any hardship presented by the $14 fee. It may be that some other worker could make out a prima facie case against Local 496, but the undisputed evi-

---

14. For the same reasons, plaintiffs also fail to show the *third* element of their prima facie case. While plaintiffs were apparently otherwise qualified for employment by the Union contractors, the plaintiffs never became qualified for a *referral* to employment by Local 496. It is the inability to compete for a *referral* that plaintiffs claim was the adverse employment action they suffered. As discussed above, the facts are undisputed that plaintiffs never qualified for a referral because of their own inaction; thus, plaintiffs fail to show they were otherwise "qualified."

15. The Court here addresses the question of liability, and plaintiffs' failure to establish a prima facie case under Title VII—it does not address standing. That plaintiffs have standing to assert a claim regarding the fee does not mean they can survive summary judgment in the absence of evidence of an adverse effect on their employment status.

dence shows Tomblin and Colvin cannot.[16]

In sum, the undisputed facts show that plaintiffs cannot prevail in this case as a matter of law. The record reveals that plaintiffs never suffered any adverse employment action at the hands of Local 496. Thus, even viewing the evidence in a light most favorable to the plaintiffs, no reasonable jury could conclude that either plaintiff has carried his burden of making out a prima facie case of discrimination. Accordingly, the motion of Local 496 for summary judgment on plaintiffs' discrimination claim must be granted.[17]

## B. Plaintiffs' Retaliation Claim.

■ In order to prevail on their claim of retaliation, plaintiffs must satisfy the same burdens of proof outlined in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, as recited above. To establish a prima facie case of retaliation, a plaintiff must show that: (1) he was engaged in a protected activity; (2) the defendant knew of plaintiff's exercise of this protected activity; (3) the defendant then took an adverse employment action; and (4) there was a causal connection between the protected activity and the defendant's actions. *Canitia v. Yellow Freight System Inc.*, 903 F.2d 1064, 1066 (6th Cir.1990), *cert. denied*, 498 U.S. 984, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990) (citing *Wrenn v. Gould*, 808 F.2d 493 (6th Cir.1987)).

■ In this case, plaintiffs cannot carry the burden of showing the third prong of their prima facie case—that Local 496 took an adverse employment action. Plaintiffs allege Local 496 "discriminat[ed] against [them] in making job referrals ... because of their having filed charges of racial discrimination and because [they] assisted others in pursuing such claims." Complaint at ¶ 22. But, as explained above, Local 496 did not discriminate against plaintiffs, either directly or in retaliation.[18]

The "adverse employment action" ascribed to Local 496 by plaintiffs is that the $14 monthly fee constituted an undue financial hardship which prevented plaintiffs from competing equally for a job referral. As explained above, however, the undisputed facts reveal that: (1) neither plaintiff re-

16. Plaintiffs do not state a disparate impact claim in this case. This is probably true because the duration of the $14 monthly fee was so short that it would be difficult to show the fee had a disparate impact on a minority plaintiff class. Whatever their reasons, plaintiffs have chosen to proceed only on a theory of individual disparate treatment.

17. In light of this ruling, the Court does not address the legitimacy of the $14 fee and expresses no opinion regarding whether a qualified plaintiff could establish that the imposition of the fee was or would be discriminatory. Furthermore, it is unnecessary to resolve the question of whether, if the fee were currently in place, the Court would enjoin defendant from continuing to impose it.

18. Unlike the "usual" case where the facts underlying a discrimination claim and a retaliation claim are distinct, the facts underlying the two claims in this case are identical. By way of example, the "usual" case involves allegations where: (1) an employer discriminates against the employee-plaintiff on January 15th; (2) because of the employer's discriminatory action on January 15th, the plaintiff files charges of discrimination with the EEOC on January 16th; and (3) the employer learns the plaintiff complained to the EEOC, so the employer retaliates against the plaintiff on January 17th. In this type of case, it is clear that the plaintiff can fail on his discrimination claim but succeed on his retaliation claim, because it may be that the employer did not discriminate in the first place, but did retaliate against the employee-plaintiff for having complained. *E.g., Dailey v. Societe Generale*, 889 F.Supp. 108 (S.D.N.Y.1995), *affirmed*, 108 F.3d 451 (2nd Cir.1997) (jury returned verdict against plaintiff on her sex discrimination claim against her employer, but in favor of plaintiff on her retaliation claim). In such a case, the employer's January 15th actions underlying the discrimination claim are different from its January 17th actions underlying the retaliation claim.

This case does not present the "usual" discrimination and retaliation claims. Plaintiffs here allege that precisely the same actions of Local 496 underlie both claims. That is, plaintiffs assert that, when Local 496 instituted the $14 monthly referral list fee, it: (1) discriminated against them on the basis of their race; and (2) retaliated against them for having brought the *Alexander* case. The Court does not mean to imply that, merely because the same factual basis underlies both the discrimination and retaliation claims in this case, the same result must ensue. That the same acts of Local 496 serve as the basis for both claims, however, means that the factual analyses of the two claims are very similar.

mained on the job referral list long enough for the $14 fee to have had any impact on their eligibility for a referral; (2) the majority of the blame for this fact must be attributed to plaintiffs' own inaction; and (3) neither plaintiff has established that they suffered any hardship (job-related or otherwise) from the short-lived $14 fee.

Put most simply, Local 496 never referred plaintiffs to jobs only because the plaintiffs never called in to maintain their position on the referral list. Plaintiffs' bald assertion that the $14 per month fee kept them off the list is contrary to their own actions and could not be accepted by any reasonable jury. Plaintiffs have not made out a prima facie case that the monthly fee was retaliatory, so the motion of Local 496 for summary judgment on plaintiffs' retaliation claim must also be granted.[19]

## V.

■ As explained above, summary judgment must be granted to defendant on both of plaintiffs' claims, because plaintiffs fail to make out a prima facie case of racial discrimination or retaliation. The Court adds here, however, that *if* plaintiffs had made out a prima facie case of retaliation, the Court would have denied summary judgment to defendant on that claim. This is because, even though Local 496 articulated legitimate, non-discriminatory reasons for its imposition of the $14 monthly fee, plaintiffs offered sufficient evidence that the legitimate reasons offered by Local 496 were pretextual.

Local 496 states that it elected to impose the $14 monthly fee upon non-members who wished to use Local 496's job referral system for two reasons: (1) to defray the costs of administering the system; and (2) to more fairly allocate the list-administration costs between non-members and members. It is undisputed that Local 496 charged the $14 monthly fee to *all* Union non-members who used the job referral system, without regard to: (1) their race, (2) whether they had ever used the system before, (3) whether they had ever complained against Local 496, or (4)

whether they were members of the plaintiff class in *Alexander.*

■ When a defendant asserts non-discriminatory reasons for its actions, it is then incumbent upon the plaintiff to establish that those reasons are merely pretexts for acts of discrimination against him. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 804–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). At all times, the burden of persuasion remains with the plaintiff to establish that the adverse employment action was the result of the unlawful discrimination. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). To show pretext, a plaintiff must be able to demonstrate *both* that the "reason was false, and that discrimination was the real reason." *Hicks,* 509 U.S. at 515, 113 S.Ct. 2742. The effect of an employer's non-discriminatory explanation is to convert the inference of discrimination based upon the plaintiff's prima facie case from a mandatory one, which the fact finder *must* draw, to a permissive one, which the fact finder *may* draw if it finds that the employer's explanation is "unworthy" of belief. The fact finder must have a sufficient basis in the evidence for rejecting the employer's explanation, however, and it is plaintiff's burden to come forward with that evidence. *Id.* at 519, 113 S.Ct. 2742.

■ The Sixth Circuit has set forth three ways for a plaintiff to meet this burden and thereby create a legitimate question for the jury in the face of an employer's articulated non-discriminatory justification for its actions. *Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1084 (6th Cir.1994). First, the plaintiff can show that the proffered reason is factually false. Second, the plaintiff can show that the proffered reason was not sufficient to justify the adverse action taken against the plaintiff. Third, the plaintiff, while not disputing the truth of the proffered reason, can present evidence to show that the proffered reasons did not actually motivate the adverse action taken. Under this third scenario, the plaintiff must

---

19. Again, in light of this ruling, the Court does not address the legitimacy of the $14 fee and expresses no opinion regarding whether a quali-

fied plaintiff could establish that the imposition of the fee was or would be retaliatory.

present some proof, beyond a *prima facie* case, of discriminatory animus. *Id.* Each of these means presents a sufficient evidentiary basis to create a "suspicion of mendacity" for the fact finder to infer an illegal motive and reject the employer's proffered explanation. *Id.* (citation omitted); *see Wheeler v. McKinley Enters.*, 937 F.2d 1158, 1162 (6th Cir. 1991) (discussing the three methods for showing pretext).

In this case, plaintiffs do not attempt to show Local 496's stated reasons for imposing the $14 monthly fee on non-members had no basis in fact, or that those reasons were insufficient to explain or justify imposition of the fee. Rather, plaintiffs take the second approach, arguing that Local 496's stated reasons were not the real reasons for its actions. Plaintiffs assert Local 496 actually imposed the fee to: (1) retaliate against them for having filed the *Alexander* action; and (2) make it more difficult for blacks to obtain job referrals. The strongest arguments plaintiffs offer to support their position are that: (1) Local 496 had a history of discrimination; (2) the imposition of the monthly fee followed so closely on the heels of the *Alexander* decision; and (3) the $14 monthly fee exceeded the $13 monthly dues charged to Union members.

The Court concludes that these arguments, taken together, create a disputed issue of fact regarding whether Local 496 would not have imposed the $14 monthly fee "but-for" the earlier discrimination claim. *See Canitia*, 903 F.2d at 1068 ("[a] plaintiff in this type of case must establish that the decision complained about as retaliatory would not have been made 'but for' the protected status of the plaintiff"). Although the evidence supporting each argument, *alone*, is insufficient to show that racial discrimination was the real reason for charging the $14 monthly fee, the arguments taken together provide sufficient evidence to create a disputed factual issue of whether Local 496's reasons were pretextual.

As noted earlier, simply invoking Local 496's "history" of discriminatory practices, *without more*, is insufficient to show that racial discrimination was the real reason, or even the primary reason, for charging the $14 monthly fee. The fee was imposed on *all* non-members, regardless of their race or whether they had made prior complaints to the EEOC. The decision to impose the fee was made after discussion by Local 496 with its counsel, to ascertain whether the action might have a discriminatory impact.

Likewise, the temporal proximity of the *Alexander* decision to Local 496's imposition of the $14 monthly fee, *by itself,* does not show that Local 496's stated reasons were not the real and primary reasons for its actions. Indeed, Judge Krenzler's ruling in *Alexander* placed Local 496 squarely in an unwanted limelight, making it highly unlikely Local 496 would continue its "historical" practice of discrimination through so visible a mechanism. Local 496 argues that the timing of the $14 fee is understandable, because it was not until the *Alexander* decision that Local 496 had reason to believe a large number of non-members might seek placement on its job referral list. Thus, the timing of Local 496's action is explained equally well by non-invidious reasons; this timing is insufficient, standing alone, to create a "suspicion of mendacity."

Finally, the fact that the $14 monthly fee charged to non-members exceeded the $13 monthly dues charged to Union members, *by itself,* also is insufficient evidence to show that Local 496's stated reasons were not the real and primary reasons for its actions. The $1 differential is concededly small and, thus, undercuts the argument that Local 496 intended to use the fee to discourage plaintiffs or minorities generally from participating on the referral list. Furthermore, the $1 differential applied to non-members of all types, not merely those who belonged to the *Alexander* plaintiff class. And, in addition to monthly membership dues, Union members were required to pay an initiation fee; this explains in part the $1 differential.[20] The "extra dollar" that non-members had to pay to obtain placement on the job referral list is, thus, insufficient evidence of pretext.

Having concluded that each of plaintiffs' arguments *individually* provides only weak

---

**20.** Indeed, after a non-member obtained a job through the referral list, he had to pay the Union membership initiation fee, at which point his monthly costs dropped to $13.

inferential support to show pretext, the Court nonetheless concludes that, *weighed together,* the evidence supporting these arguments is sufficient to raise a material issue of fact regarding whether Local 496's proffered reasons were the real or primary reasons behind its actions. A reasonable jury could conclude that the sum of this evidence shows Local 496's stated reasons for imposing the $14 monthly fee were false, and that retaliation was the real reason. As LIUNA itself noted, when it ordered Local 496 to rescind the $14 monthly fee, "it [is] possible to do a lawful act for an improper reason." There exists enough evidence in this case to raise a material issue of fact whether Local 496 did precisely this. Thus, if plaintiffs had made out a prima facie case on their claim of retaliation, the Court would deny summary judgment to defendant.

### Conclusion

As noted above, on the undisputed facts presented, plaintiffs cannot establish a prima facie case of either discrimination or retaliation. Given the Court's conclusions on the issue of pretext, it appears that Local 496 has been saved from continued participation in this litigation by (1) the International Union's decision to put a stop to the $14 fee after only one month, and (2) the fact that the particular plaintiffs who chose to challenge the $14 fee suffered no employment-related adverse consequences from having to pay the fee. While the Court certainly does not condone any act which is, or even appears to be, retaliatory, the Court may not pass judgment on a defendant's conduct absent a legally cognizable injury to a named plaintiff. Title VII prohibits employment-related discrimination. No legally cognizable employment related injury, to either plaintiff, can be attributed to the one month $14 fee at issue in this case.

For these reasons, defendants' Motion for Summary Judgment must be **GRANTED** as to both claims of both plaintiffs. This case is **DISMISSED** accordingly.

**IT IS SO ORDERED.**